ROBERT S. BOULTER (SBN 153549)
rsb@lb-attorneys.com
PETER C. LAGARIAS (SBN 77091)
pcl@lb-attorneys.com
Lagarias & Boulter L.L.P.
1629 Fifth Avenue
San Rafael, California 94901-1828
Telephone: (415) 460-0100
Facsimile: (415) 460-1099

**FILED**

MAY 27 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDL

CV 11 2586

| | |
|---|---|
| CHARLES ROBERTS, an individual, and KENNETH MCKAY, and individual, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> C.R. ENGLAND, INC., a Utah corporation; OPPORTUNITY LEASING, INC., a Utah corporation; and HORIZON TRUCK SALES AND LEASING, LLC. a Utah Limited Liability Corporation <br> Defendants | CASE NO. <br><br> <u>CLASS ACTION COMPLAINT FOR:</u> <br><br> 1. CALIFORNIA FRANCHISE INVESTMENT LAW VIOLATION <br><br> 2. CALIFORNIA SELLER ASSISTED MARKETING PLAN ACT VIOLATION <br><br> 3. CALIFORNIA UNFAIR COMPETITION LAW VIOLATION <br><br> 4. UTAH CONSUMER SALES PRACTICES ACT VIOLATION <br><br> 5. UTAH BUSINESS OPPORTUNITY DISCLOSURE ACT VIOLATION <br><br> 6. INDIANA BUSINESS OPPORTUNITY TRANSACTIONS LAW VIOLATION <br><br> 7. FEDERAL TELEMARKETING AND CONSUMER FRAUD AND ABUSE PREVENTION ACT VIOLATION <br><br> 8. COMMON LAW FRAUD <br><br> 9. UNJUST ENRICHMENT <br><br> 10. DECLARATORY RELIEF <br><br> JURY TRIAL DEMANDED |

1

1

**DESCRIPTION OF CASE**

2          1.          Plaintiffs Charles Roberts (Roberts) and Kenneth McKay (McKay) bring this

3     class action on behalf of individuals (the "Drivers") that the defendants C.R. England Inc.

4     (ENGLAND), Opportunity Leasing, Inc. d/b/a Horizon Truck Sales and Leasing, and Horizon

5     Truck Sales and Leasing, LLC (collectively, HORIZON) (collectively all referred to as

6     "Defendants") fraudulently induced into purchasing a business opportunity to drive big rig

7     trucks (the "Driving Opportunity").

8          2.          Defendants are affiliated transportation industry companies that are

9     headquartered at the same offices in Salt Lake City, Utah and that have offices and operations in

10    California, Indiana and elsewhere.  Defendants' customers include Wal-Mart and other

11    businesses that ship goods around the country via tractor-trailers.  Defendants transport some

12    customers' goods via company employees and company-owned trucks but the majority of goods

13    are transported by Drivers that have purchased the Driving Opportunity.

14         3.          Although the Driving Opportunity is a franchise and/or business opportunity

15    under federal, California, Utah, and Indiana law, Defendants have never complied with the

16    applicable registration, disclosure, and anti-fraud provisions of those laws.  Defendants made

17    uniform misrepresentations, misleading statements, and concealed material information when

18    offering and selling the Driving Opportunity to the Drivers in derogation of the applicable

19    statutes and common law.

20         4.          Because the turnover rate of Drivers is extremely high (as the Drivers cannot

21    earn any money in the Driving Opportunity), the Defendants run thousands of nationwide

22    weekly advertisements for new recruits via newspapers, employment agencies, and the internet.

23    Examples of such advertisements are attached hereto in Exhibit A and are hereby incorporated

24    by reference.  Defendants post such ads and otherwise initially recruit candidates by

25    fraudulently offering them "guaranteed jobs" if the candidates complete training at the

26    ENGLAND truck driving schools located in, among other places, Mira Loma, California and

27    Burns Harbor, Indiana.

28         5.          Defendants' dedicated website at www.crengland.com uniformly and

2

1    fraudulently represents that it offers guaranteed jobs to candidates. Excerpts from Defendants'

2    website are attached hereto in Exhibit B and are hereby incorporated by reference. Defendants

3    also employ recruiters that cruise for Drivers in such places as homeless shelters and soup

4    kitchens.

5         6.    Defendants charged the Drivers tuition for ENGLAND truck driving school

6    in the approximate amount of $2,000 if the Drivers paid cash. More commonly, the Drivers had

7    no money and Defendants charged them $3,000 at 18% to be repaid out of future earnings. On

8    information and belief, Defendants also secure federal government funding or reimbursement

9    related to the Drivers' training.

10       7.    In a classic bait and switch fraud beginning with the Driver's recruitment into

11    ENGLAND truck driving school and afterwards, the Defendants subjected the Drivers to a

12    variety of fraudulent acts and manipulative techniques to convince them to purchase the Driving

13    Opportunity instead of seeking the "guaranteed job" that Defendants offered and advertised. If

14    a prospective Driver resisted purchasing the Driving Opportunity and insisted on obtaining

15    employment, Defendants ultimately told them either that they must purchase the Driving

16    Opportunity for at least six months before they will be considered for employment or that they

17    must wait an indefinite period for a truck to become available. Because of Defendants' conduct,

18    the vast majority of all persons completing Defendants' truck driving school purchased the

19    Driving Opportunity.

20       8.    Defendants' conduct is a fraudulent scheme targeting and injuring the

21    Drivers. Defendants defraud the Drivers into paying for all the expenses of transporting goods

22    for Defendants' customers by making uniform false and misleading written and oral

23    representations about the Driving Opportunity and by concealing material facts. The Drivers'

24    expenses paid to Defendants include truck rental, gas, maintenance, computers, and other

25    expenses associated with the Driving Opportunity. Defendants also retain all the money their

26    customers pay for transporting goods.

27       9.    Roberts, McKay, and the Drivers were damaged by paying Defendants

28    money for the Driving Opportunity including for training tuition, truck rental, gas, maintenance,

**CLASS ACTION COMPLAINT**

1  computers, and other expenses associated with the Driving Opportunity. After paying such

2  expenses, the Drivers had little or no compensation or even owed Defendants money despite the

3  long hours they worked as Drivers. Thus, the Drivers were also damaged because Defendants

4  defrauded them out of their labor.

5          10.    In sum, Defendants have perpetrated a fraud scheme directed from Utah but

6  implemented in California, Utah, and Indiana that has defrauded the Drivers out of their labor

7  and money.

8          11.    Roberts and McKay file this action against C.R. England, Inc., Opportunity

9  Leasing, Inc., and Horizon Truck Sales and Leasing, LLC for themselves and others similarly

10  situated, to redress the unlawful conduct noted in this complaint. Roberts was a Driver from

11  approximately September 2009 to June 2010. McKay was a Driver from approximately July

12  2009 to September 2009. Roberts and McKay seek to certify an appropriate class action under

13  Rule 23 of the Federal Rules of Civil Procedure that will assert claims under laws of the United

14  States, Utah, California, and Indiana.

15                          **JURISDICTION AND VENUE**

16

17          12.    Jurisdiction over Roberts' and McKay's claims is based upon diversity

18  jurisdiction and Class Action Fairness Act provisions under 28 U.S.C. §§ 1332 (a) and (d).

19  Jurisdiction and venue are also based on the Telemarketing and Consumer Fraud and Abuse

20  Prevention Act ("TCFAPA"), 15 U.S.C. § 6104 (a) and (f).

21          13.    The Court has supplemental jurisdiction over Plaintiffs' state law claims

22  pursuant to 28 U.S.C. § 1367(a).

23          14.    This Court has personal jurisdiction over the Defendants because Defendants

24  purposefully availed themselves of the laws and resources of the State of California by

25  marketing, offering, and selling the Driving Opportunity here and because they have offices and

26  facilities in California including within the district.

27          15.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b). At all times

28  material herein, C.R. England, Inc, Opportunity Leasing, Inc., and Horizon Truck Sales and

                                    4

1  Leasing, LLC have actively been conducting business in the State of California and within the

2  geographic area encompassing the Northern District of the State of California. A substantial

3  part of the events or omissions giving rise to the claims occurred in this judicial district and one

4  or more of the Plaintiffs reside within this District in Sonoma County, California. Defendants

5  regularly target candidates for the Driving Opportunity in this district and disseminate their false

6  advertising in this district. For example, Defendants advertise within the district offers of a

7  "guaranteed job as C.R. England Truck Driver," and the ability to "start your own business as a

8  lease operator," and that "C.R. England...has never laid off a truck driver." Exemplars are

9  contained in Exhibit A. As noted in Exhibit A, Defendants expressly advertise these jobs as

10  being located within the district in Vallejo, San Francisco, San Jose, Oakland, Santa Rosa, Santa

11  Cruz, Cloverdale, Emeryville, San Mateo, and Sunnyvale. On information and belief,

12  Defendants have offices and employ personnel in this district including, but not limited to,

13  American Canyon, California.

14          16.      Venue in this district is also proper pursuant to 15 U.S.C. § 6104 (a) because

15  Defendants are found in and transact business within the district. In addition, the California

16  Franchise Investment Law favors franchise litigation in California by voiding any contractual

17  non-California forum choice.

18          17.      Intradistrict Assignment. The basis for assignment to the San Francisco

19  Division of the Northern District of California is that Roberts resides in, performed, and

20  headquartered his duties as a Driver in Santa Rosa, California.

21                                  **THE PARTIES**

22

23          18.      Charles Roberts is a citizen of the State of California and resides in Sonoma

24  County, California.

25          19.      Kenneth McKay is a permanent resident of the State of California and resides

26  in San Bernardino County, California.

27          20.      Roberts, McKay, and the Drivers have been injured by Defendants' illegal

28  practices and conduct alleged in this Complaint.

21.    Roberts' and McKay's claims for relief alleged in this Complaint are similar to and typical of the Drivers' claims.

22.    Defendants C.R. England, Inc and Opportunity Leasing, Inc., are Utah corporations with their principal places of business in Salt Lake City, Utah.

23.    Horizon Truck Sales and Leasing, LLC is a Utah limited Liability Corporation with its principal place of business in Salt Lake City, Utah.

24.    On information and belief, C.R. England, Opportunity Leasing, Inc., and Horizon Truck Sales and Leasing, LLC do business throughout the State of California.  At all material times, the Defendants owned and/or operated a facility related to the offered business opportunities in Mira Loma, California.

25.    On information and belief, C.R. England and/or Horizon Truck Sales and Leasing, LLC are the successors in interest to and/or alter ego of Opportunity Leasing, Inc., which entity is the party to certain truck lease contracts with the Drivers.

26.    C.R. England, Inc., Horizon Truck Sales and Leasing, LLC, and Opportunity Leasing, Inc. have at all material times hereto been the alter egos of each other.

27.    Plaintiffs are informed and believe and thereon allege that at all times mentioned herein each of the Defendants was acting as the agent, affiliate, partner, joint venture employee, and/or co-conspirator of each of the remaining Defendants, and that all the Defendants' acts alleged herein were within the course or scope of such agency, affiliation, partnership, joint venture, employment, and/or conspiracy.  Plaintiffs are further informed and believe and thereon allege that at all times mentioned herein each of the Defendants ratified and or authorized the wrongful acts of the remaining Defendants and each of them, or is otherwise liable for the conduct of the remaining Defendants.

## **GENERAL ALLEGATIONS**

28.    Roberts is a former Driver for ENGLAND and HORIZON.  ENGLAND is a large national trucking company specializing in the refrigerated transportation of customer goods (e.g. perishable food items).  HORIZON is, on information and belief, affiliated with or

6

1    the alter ego of ENGLAND and is the entity that ENGLAND designates to rent the Drivers

2    trucks and other items necessarily utilized in the Driving Opportunity.

3           29.     In about May 2009, from his home in Santa Rosa, California, Roberts viewed

4    ENGLAND's advertising on its website and found interesting ENGLAND's representations of

5    training, employment, the Driving Opportunity, and the potential income at ENGLAND.

6    Roberts does not currently have the actual 2009 ENGLAND advertising from its website pages

7    but the pages and information therein were very similar, if not identical, to advertising content

8    found on ENGLAND's current nationwide website in May 2011 and downloaded in California

9    and within the Northern District of California.

10           30.     In that May 2011 nationwide website found at www.crengland.com, found at

11    Exhibit B and hereby incorporated by reference,  Defendants write on the first page:

> C.R. England offers all truck drivers an excellent opportunity to lease a truck and enjoy the freedoms of owning their own truck driving company. Lease operators enjoy the benefit of a partner that is dedicated to helping them be successful in their truck driving career....

> **Truck driving students, who complete the course at a C. R. England Truck Driving School, are guaranteed a job with C. R. England....**[bold emphasis added]

> A truck driver with C. R. England has many choices for a career with C. R. England.  A driver can own his own business as an Independent Contractor by leasing his own truck.  England will lease a truck to the driver for no money down and no credit check, and then contract with the Independent Contractor to deliver freight.

       31.     Defendants further write in their website:

> C.R. England has provided truck driving jobs to experienced and in experienced truck drivers alike for more than 90 years. Inexperienced truck drivers or those who want to start their truck driving career can attend one of four truck driving schools offered by C.R. England for a truck driver training program considered among the best in the industry. Admission to the C.R. England truck driving school does not require a cosigner, money down, or credit requirements. C.R. England truck driving school includes

7

1   Commercial Driver's License (CDL) classroom training and behind
2   the wheel training. **Successful graduates of the C.R. England
    truck driving training program are guaranteed CDL jobs
3   through C.R. England.** [bold emphasis added]

4   There are also excellent opportunities for experienced truck drivers
    as C.R. England offers a variety of career choices. You can choose
5   these career paths:
    Company Driver
6   Company Team Driver
    Driver Trainer
7   Independent Contractor or Lease Operator

8   Exhibit B, pp. 71-72.

9       32.     On the training page of that website, ENGLAND represents that "You are

10  GUARANTEED a job upon successful completion of our training program." Exhibit B, p. 73.

11      33.     With respect to the Driving Opportunity, ENGLAND and HORIZON made

12  factual representations in pertinent part on ENGLAND's May 2011 nationwide website:

13  Own Your Own Business As An Independent Contractor

14
15  You can own your own business by leasing a truck and becoming
    and independent contractor for C.R. England.  You can lease a
16  truck with no money down and then contract with C.R. England to
    deliver freight.  By leasing your own truck you have the
17  opportunity of making more money than a company driver.

18  ***
19  As of January of 2011, many independent contractors operating
    solo have earned big money! Examples include:

20
21      • $4,600 per month for a solo operating his truck on a lease
          purchase plan!
22      • $5,500 per month for a solo operating his truck that he's
          purchased and now runs under C.R. England's operating
23        authority!
        • Nearly $3,000 per month for a team with less than 6-months
24        experience operating his truck on a short-term lease plan!

25  As of January of 2011, many independent contractors operating as a
    team have earned big money! Examples include:
26
27      ▪ $9,800 per month for a team operating his truck on a lease
          purchase plan!
28      ▪ $12,000 per month for a team operating his truck that he's

8

purchased and now runs under C.R. England's operating authority!

- Nearly $8,500 per month for a team with less than 6-months experience operating his truck on a short-term lease plan!

Exhibit B, pp. 75-78.

34.    Defendants' website advertising noted in preceding paragraphs 29, 30, and 32 constitute the offer of unregistered business opportunities and/or franchises. Defendants therein also make false and misleading representations including false, misleading, and unlawful financial performance representations. Specifically, Defendants concealed the true facts that persons leasing trucks do not have the opportunity to make more money than company drivers, that not many independent operating solo or as team earn big money (as defined in the examples), and that the specific examples of income levels are fabricated by Defendants. Defendants concealed that most Drivers fail within a year or two and do not make any significant net earnings as a Driver, if they earn anything at all.

35.    Induced by the descriptions Roberts viewed, which were similar to those noted above in paragraphs 29 -32, Roberts submitted an online application from his home in Santa Rosa, California. Within days thereafter, an ENGLAND representative from Utah called Roberts at his home in Santa Rosa. The ENGLAND representative interviewed Roberts at length about his background and asked for his tax returns, which Roberts then sent from California to ENGLAND. During this call, the ENGLAND representative touted ENGLAND and the income opportunity it was offering.

36.    An ENGLAND representative subsequently called Roberts at his home in Santa Rosa and told him that ENGLAND wanted him to attend ENGLAND's training school at its facility in Mira Loma California. During this call, the ENGLAND representative touted ENGLAND and the income opportunity it was offering. The ENGLAND representative told Roberts that ENGLAND would purchase a Greyhound bus ticket for him and transport him from Santa Rosa to Mira Loma, California and that the bus ticket would be waiting for him at the Santa Rosa bus station. The representative never mentioned to Roberts the high turnover and failure rates of Defendants' drivers, that Drivers did not and could not earn what the website

9

1  had represented, or that the Defendants were baiting him with promises of guaranteed

2  employment but planned to switch him to the Driving Opportunity.  During this call, the

3  ENGLAND representative never mentioned that ENGLAND could not possibly employ the

4  hundreds or thousands of students it trains annually through its driving schools.

5     37. In about June 2009, Roberts picked up the bus ticket that ENGLAND had

6  purchased and boarded a bus in Santa Rosa bound for training at ENGLAND's truck driving

7  school in Mira Loma.  ENGLAND lodged Roberts and about 130 or so other Driver candidates

8  at the nearby ENGLAND owned hotels.  At training, Roberts met other candidates, two of

9  whom told Roberts that they were homeless and had been personally recruited by ENGLAND

10  representatives while at a homeless shelter and standing in line at a soup kitchen.

11     38. The first days at training consisted of background checks and physicals.

12  Roberts and others passed and went on to training.  On about the third day of training,

13  ENGLAND provided certain paperwork and collected the training tuition payments from the

14  candidates. In Robert's case, ENGLAND presented him with a note in favor Eagle Atlantic

15  Financial (another apparent ENGLAND affiliate) for $3,000 with 18% interest.

16     39. During training in Mira Loma, pursuant to a common course of conduct

17  implemented at all Defendants' training schools, ENGLAND and HORIZON presented to

18  Roberts and all other Drivers the "England Business Guide" (the Guide).  Excerpts of the Guide

19  are attached hereto as Exhibit C and hereby incorporated by reference.  In the Guide,

20  ENGLAND and HORIZON made representations about ENGLAND employment opportunities

21  and the Driving Opportunity.  Defendants made factual representations in the Guide about the

22  Driving Opportunity and the income it offered, including, but not limited to:

23       a. Graphs showing comparative income levels (in specific dollar amounts)

24        between those purchasing the Driver Opportunity and employee drivers

25        over a ten-year period accompanied by the caption that "independent

26        contractors make, more money faster than company drivers do."

27       b. A graph showing that those purchasing the Driving Opportunity averaged

28        "33% more miles than company drivers do. More miles can equal more

10

1                 money." Another graph stating that in "this graph, you can see that 21%

2                 of independent contractors make more than $50,000 per year. Only 12%

3                 of company drivers make that same amount."

4         c.    An exemplar spreadsheet projecting average weekly gross income of

5                 $4,247.71 and net income $1,013.83 along with other relevant financial

6                 projections.

7 Exhibit C, pp. 88-90.

8        40.      Defendants made the following relevant representations stating in pertinent

9 part in the Guide:

10       C.R. England welcomes you in this new business relationship. The
independent contractor (IC) program was created for drivers who
11       wish to succeed while being their own boss. We are excited to help
your business make money. The England Business Guide will give
12       you several tools and examples that will help you accomplish your
13       goals and prosper as an independent contractor.

14       Let's see what other independent contractors have to say about their
business experiences with C.R. England:
15

16           •   "The money is fantastic."
          •   "I've come a long way working with this company. When I
17              came here, I didn't have anything. Now I've got a house,
             new cars, and money in the bank."
18           •   "I decided to become an independent contractor when I
             looked at the amount of money I could make as an
19              independent contractor. It basically doubled my income."
20           •   "The reason I decided to become an independent contractor
             was because of the money…"
21
Exhibit C, p. 82.
22
       41.      Defendants' representations noted in the preceding paragraphs 38 and 39
23
constitute the offer of unregistered business opportunities and/or franchises. Defendants therein
24
also make false and misleading representations including false, misleading, and unlawful
25
financial performance representations. Specifically, Defendants concealed the true facts that
26
persons leasing trucks do not "make more money faster than company drivers do," that
27
independent contractors do not average 33% more miles than company drivers, that 21% of
28

**CLASS ACTION COMPLAINT**

1    independent contractors do not earn more than $50,000, that the pro formas were false, and that

2    the testimonials were false and fabricated.  Defendants concealed that most Drivers fail within a

3    year or two and do not make any significant net earnings as a Driver, if they earn anything at all.

4         42.    Kenneth McKay is a former Driver for ENGLAND and HORIZON and his

5    experience was similar to Roberts' experience.  In about late January 2009, from his home in

6    San Jacinto, California, McKay viewed ENGLAND's advertising on its website and found

7    interesting the website's representations of training, employment, the Driving Opportunity, and

8    the potential income at ENGLAND.  As with Roberts, McKay does not currently have the actual

9    2009 ENGLAND advertising from its website pages but the pages and information therein were

10   very similar, if not identical, to advertising content noted above in paragraphs 29-31.

11        43.    Induced by the information McKay viewed, McKay submitted an online

12   application to ENGLAND.  Shortly thereafter, an ENGLAND representative from Utah called

13   McKay at his home in San Jacinto.  The ENGLAND representative interviewed McKay at

14   length about his background.  During this call, McKay asked the representative if he would earn

15   at least $30,000 per year.  The representative told McKay that this would be "no problem" and

16   that ENGLAND drivers' earned more than $30,000 per year.

17        44.    An ENGLAND representative subsequently called McKay at his California

18   home and told him that ENGLAND wanted him to attend ENGLAND training school at its

19   facility in Mira Loma, California.  McKay again asked the ENGLAND representative if he

20   would earn at least $30,000 per year and was again assured by ENGLAND that he would.  The

21   representative never mentioned to McKay the true facts of high turnover and failure rates of

22   Defendants' Drivers, that most Drivers never earned anything close to $30,000 per year, or that

23   Defendants were baiting him with promises of guaranteed employment but planned to switch

24   him to the Driving Opportunity.

25        45.    McKay attended ENGLAND training school at Mira Loma in approximately

26   February 2009.  As with Roberts, McKay Defendants presented and McKay signed a note

27   contract in favor Eagle Atlantic Financial for $3,000 with 18% interest.

28        46.    At ENGLAND training school, ENGLAND and HORIZON gave McKay and

12

1    others the "England Business Guide" and told them to carefully review it.  In the Guide,

2    ENGLAND and HORIZON made representations about ENGLAND employment opportunities

3    and the Driving Opportunity and the income it offered as noted in paragraph 38 and 39.

4    Pursuant to a common pitch and script, Defendants training school instructors sought to

5    dissuade all candidates from seeking employment in favor of purchasing the Driving

6    Opportunity by making statements such as the following: "no matter what, a driver who leases

7    makes more then a company driver," "if you think you're going have a decent income you are

8    wrong and need to lease," "if you want the income you expect while being a cross-country

9    driver you need to lease," "who here doesn't want to make money," "if you go company you

10   will be disappointed," and "who wants to end up saying welcome to McDonalds may I help you,

11   because if you don't listen that's where your going to end up."  These representations were false

12   and/or misleading.  Defendants concealed the true facts that Drivers purchasing the Driving

13   Opportunity did not earn more than company drivers, that the Driving Opportunity was a

14   demonstrable failure, that most Drivers failed within a year or two, and that Drivers did make

15   significant net earnings if any at all.

16        47.    After completing ENGLAND's truck driving school and securing a

17   commercial driver's license, Roberts, McKay and other Drivers spent approximately 90 days on

18   the road as "back up" drivers to another ENGLAND driver in periods known as Phase I (30

19   days) and Phase II (60 days) training. At the end of Phase II, Defendants returned all Drivers to

20   either Defendants' headquarters in Salt Lake City, Utah or their facility in Burns Harbor,

21   Indiana.

22        48.    Regardless of the whether Defendants sent the Drivers to Salt Lake City,

23   Utah or Burns Harbor, Indiana, Defendants' pursued the following course of common conduct

24   at each location with respect to all Drivers post Phase II.  Under the guise of "additional

25   training" and/or "evaluation" classes, Defendants pressured and conned Drivers into purchasing

26   the Driving Opportunity.  Defendants told the Drivers that purchasing the Driving Opportunity

27   would provide them greater income and that they would be able to drive new or newer trucks

28   that they could take pride in.  Conversely, Defendants dissuaded Drivers from seeking

13

CLASS ACTION COMPLAINT

employment by telling them, among other things, that employees made less money and would

be assigned older and decrepit trucks.  Defendants also, for the first time, gave the Drivers a

form document titled "The Horizon Truck Sales and Leasing Independent Contractor Program"

on the first page and "C.R. England....Independent Contractor Program" on subsequent pages.

A copy of this document is attached as Exhibit D and hereby incorporated by reference.

Defendants told the Drivers to review the document carefully.  This document constituted

Defendants' offer of a business opportunity and/or franchise to the Drivers and it contained false

and misleading representations including false, misleading, and unlawful financial performance

representations.  Specifically, this document represented in pertinent part:

> This program allows you to further your career by becoming and
>
> Independent Contractor.   You can lease a truck and avoid the
>
> hassles and initial expenses of buying a truck....Program highlights
>
> are:
>
> - An operating agreement with C.R. England
> - BEST PAY in the industry, earn up to $1.53. per mile...
> - Friendly priority dispatch with an average length of haul of
>   1,500 miles
> - Successful business plan with mentoring and support staff...
>
> Please review the enclosed lease 'pro-forma.'

49.     Defendants' representations in Exhibit D were false, misleading, and

unlawful financial performance representations.  Specifically, Defendants concealed the true

facts that Defendants did not offer the "best pay in the industry," did not offer up to $1.53 per

mile driven, did not offer an average length of haul of 1,500 miles, and did not offer a

"successful business plan."  The true facts were that Defendants offered the worst pay in the

industry, payment schemes that did not pay drivers for all miles driven, an average length of

haul that was far less than 1,500 miles, and its "successful business plan" was a demonstrable

failure.

50.     The pro formas found in Exhibit D constitute financial performance

representations and are unlawful when presented outside required franchise and/or business opportunity disclosures documents.  Moreover, the pro formas were false and/or misleading in that they:

      a.  unrealistically assume earnings based on a 52 week year

      b.  assume a false average mileage rate of .90 per mile;

      c.  made false and/or misleading and/ or incomplete representations and assumptions about the amount of income expenses.  The pro formas did not include all of the expenses a Driving Opportunity purchaser would incur in connection with the Driving Opportunity thereby leading to a false and/or misleading bottom line representation in the weekly and annual income sections of the pro forma.

      d.  failed to disclose the high turnover and failure rates of Defendants' drivers or that Defendants and that few, if any, Drivers achieved anything close to the represented income and expenses.

      51.    Defendants at this time rebuffed any Drivers that stated they wanted to be employees and take advantage of the Defendants' promises of guaranteed employment. Defendants told such persons they would have to purchase the Driving Opportunity and otherwise pressured, shamed, or manipulated them into purchasing the Driving Opportunity using similar techniques to those noted in paragraph 45.  For those Drivers that remained unpersuaded and persisted in seeking employment, ENGLAND and HORIZON eventually told them either there were no available positions and/or that they had to purchase the Driving Opportunity, take it or leave it, for a minimum of six months before being considered for employment.

      52.    Indeed, at the end of Phase II training, ENGLAND told McKay that there were no positions available for company employee drivers and that he would have to purchase the Driving Opportunity on a three-year lease.  McKay declined and instead insisted on employment or a maximum six-month lease.  At this point, Defendants told McKay (and others) that they had no trucks available for six-month leases despite McKay observing a yard full of

**CLASS ACTION COMPLAINT**

trucks. These representations were false and were made to coerce McKay and others to purchase the Driving Opportunity. Indeed, Defendants told McKay and other Drivers that while trucks for company drivers were not available, if they signed a two or three-year lease deal they could begin immediately and trucks were immediately available. Otherwise, Defendants told McKay and other Drivers that they would have to wait. McKay held out for a few weeks at Defendants' facility in Utah until Defendants finally offered him a Driving Opportunity under a six-month lease. But many other Drivers he observed that were hungry (literally, as Defendants provided Drivers a mere $7.00 per day for food at the company store/restaurant), tired, and lacking any income capitulated and purchased the Driving Opportunity under two or three-year leases.

53.    After the Drivers had agreed to purchase the Driving Opportunity, Defendants for the first time presented the Drivers with the actual Driving Opportunity contracts described below.

54.    As to all Drivers, Defendants' conduct, representations, and distribution of documents noted in the preceding paragraphs 47 to 52 occurred in either Utah or Indiana and constituted the offer of a business opportunity and/or franchise under the laws of those states. Defendants did not register the business opportunity and/or franchise or provide the Drivers with disclosure documents required by Utah and/or Indiana law. As noted in paragraphs 47 to 52, Defendants also made false and misleading representations including false, misleading, and unlawful financial performance representations.

55.    In reliance on the information Defendants had provided to that point as well as the omitted material information, Roberts, McKay, and the Drivers signed the nonnegotiable form "Independent Contractor Operating Agreement" (the "Contractor Agreement") that Defendants presented to each of them. As to all Drivers, the Contractor Agreement was executed in either Utah or Indiana. Roberts' Contractor Agreement is attached as Exhibit E to this complaint and was executed in Utah by Roberts and ENGLAND on or about September 29, 2009. McKay's Contractor Agreement is substantially identical to Exhibit E and was executed by McKay and ENGLAND in Utah on or about July 13, 2009.

16

56.     At the same time and place that the Contractor Agreement was presented to the Drivers, Defendants presented each Driver a nonnegotiable form "Truck Sales and Leasing Vehicle Lease Agreement" (the "Lease Agreement") that they required each Driver sign. Roberts' Lease Agreement is attached as Exhibit F to this complaint and was executed in Utah by Roberts and HORIZON on or about September 29, 2009.  McKay's Lease Agreement is substantially identical to Exhibit F and was executed by McKay and HORIZON in Utah on or about July 13, 2009.

57.     The Lease Agreements that Roberts and McKay signed in Utah on September 29, 2009 and July 13, 2009, respectively, are facially between them and an entity stated as Opportunity Leasing, Inc. d/b/a Horizon Truck Sales and Leasing.  However, according to records from the Utah Department of Commerce, Division of Corporations and Commerce, Opportunity Leasing, Inc.'s d/b/a as Horizon Truck Sales and Leasing expired on August 28, 2008 for the reason that a "different entity" was created. These records are attached as Exhibit G and hereby incorporated by reference. The records also show that Horizon Truck Sales and Leasing, LLC was created on August 28, 2008.  On information and belief, Horizon Truck Sales and Leasing, LLC is the successor in interest or otherwise to Opportunity Leasing, Inc. and is a responsible party to the Lease Agreements with some, if not all, the Drivers.  On information and belief, all of the Drivers performance under the Lease Agreement was tendered by Drivers to HORIZON and to ENGLAND.  On information and belief, HORIZON and ENGLAND were all entities intended to perform and be bound by the Lease Agreement.  The plaintiffs will amend this Complaint if and as necessary should discovery provide further relevant information about the contractual relationship between the Drivers and HORIZON.

58.     Defendants' presentation, and the parties' respective executions, of the Lease Agreement and the Contractor Agreement were part of a single transaction and constituted the sale of business opportunities and/or franchises under applicable law.

59.     The Contractor Agreement and Lease Agreement coupled with the terms and conditions under which ENGLAND and HORIZON required the Drivers to train, perform, work, and pay fees constitute a franchise under federal law, California law, and Utah law.

60.     The Contractor Agreement and Lease Agreement coupled with the terms and conditions under which ENGLAND and HORIZON require the Drivers to train, perform, work, and pay fees constitute a "business opportunity" and/or "seller assisted marketing plan" under federal law, California law, Utah law, and Indiana law.

61.     ENGLAND and HORIZON at all material times were and are required to comply with laws governing the sale and registration of franchises and/or business opportunities but they have never done so.  ENGLAND's and HORIZON's failure to register and make the required disclosures in the required form in the offer and sale of the Driving Opportunity under these laws triggers a strict liability right to rescission and damages on behalf of all Drivers.  This Complaint serves as notice to the Defendants of the Drivers seeking rescission.

62.     In addition to making unlawful financial performance representations under the applicable franchise and/or business opportunity statutes, ENGLAND and HORIZON's representations and advertising noted in paragraphs 4, 5, 29- 32, 38-39, 45, 47, 49, 50-52, and the exhibits referenced therein, were willfully false, misleading, and omitted material information in connection with the offer and sale of franchises and/or business opportunities. The noted conduct also runs afoul of applicable consumer protections statutes.

63.     Defendants fraudulently induced and misled Roberts, McKay and the Drivers into signing the Contractor Agreement and Lease Agreement by misrepresenting and concealing material facts noted above in paragraphs 4, 5, 29- 32, 38-39, 45, 47, 49, 50-52 and because, at all material times:

      a.  ENGLAND and HORIZON knew but concealed that they did not guarantee students employment but rather engaged in a fraudulent bait and switch to get Drivers to purchase the Driving Opportunity.

      b.  ENGLAND and HORIZON knew but concealed that ENGLAND could not possibly guarantee students employment because ENGLAND could not (and did not) employ all of the students it induced to enroll in their training school.

      c.  ENGLAND and HORIZON knew but concealed that the vast majority

18

1        Drivers purchasing the Driving Opportunity failed within a year or two

2        because the Drivers could not make enough money.

3     d. ENGLAND and HORIZON knew but concealed that the vast majority

4        Drivers purchasing the Driving Opportunity did not make as much money

5        as company drivers making the representations noted in paragraph 32, 38,

6        45, 47, 48, 49, 50, and exhibits there referenced false and misleading.

7     e. ENGLAND and HORIZON knew but concealed that no significant

8        portion of those that had purchased the Driver Opportunity earned

9        anything approaching what they had represented as noted in paragraphs

10       32, 38, 45, 47, 48, 49, 50, and exhibits there referenced false and

11       misleading.

12    f. ENGLAND and HORIZON knew but concealed the extremely high

13       failure and turnover rate of those purchasing the Driver Opportunity in

14       order to perpetuate their fraud scheme.

15    g. ENGLAND and HORIZON knew but concealed that no significant

16       portion of those that had purchased the Driver Opportunity had made a

17       "career" of driving for Defendants making that representation noted in

18       paragraph 30 false and misleading.

19    h. ENGLAND and HORIZON knew but concealed that most of the Drivers

20       ended up leaving the system in debt to ENGLAND and HORIZON and

21       its affiliates under the contracts.

22    i. ENGLAND and HORIZON knew of these inaccuracies and the falsity of

23       their advertising, website representations, the Guide projections and

24       information, the pro formas, the in person representations, and intended

25       them to induce Roberts, McKay, and the Drivers to purchase the Driving

26       Opportunity.

27    64. In sum, ENGLAND and HORIZON concealed that the entire Driving

28  Opportunity was a fraud scheme designed to defraud the Drivers out of their labor and to have

19

1    the Drivers pay the Defendants expenses associated with transporting goods.

2        65.    Roberts and McKay challenge ENGLAND's and HORIZON's fraud in the

3    sale of franchises and/or business opportunities as unlawful under California, Indiana, and Utah

4    law.

5        66.    Roberts and McKay assert all claims as a conventional "opt out" class action

6    under Rule 23 of the Federal Rules of Civil Procedure. The Utah Consumer Sales Practices Act

7    claim is asserted, in the alternative, as an opt-in class action under the terms of that statute

8    should Rule 23 not control.

9        67.    The Class Action is brought on behalf of all persons who have been, are

10    and/or will be associated with ENGLAND and HORIZON as Drivers under the Contractor

11    Agreement and Lease Agreement during the respective applicable statutory limitations periods

12    preceding the filing of this complaint to the present.

13        68.    Roberts and McKay, on behalf of themselves and those similarly situated,

14    seek from the Defendants all available statutory and common law remedies including

15    compensatory and exemplary damages, restitution, disgorgement, attorneys' fees, costs, interest,

16    declaratory relief, and injunctive relief.

17

**CLASS ACTION ALLEGATIONS**

18

19        69.    Roberts and McKay propose a Class consisting of all Drivers nationwide that

20    purchased the Driving Opportunity, which will be afforded a remedy under applicable laws.

21        70.    Roberts and McKay propose the following sub-classes:

22            a.    A Utah Class, consisting of all Drivers who physically signed the Lease

23                Agreement and Contractor Agreement in Utah, which will be afforded a

24                remedy under applicable Utah laws;

25            b.    A California Class, consisting of all Drivers that were offered the Driving

26                Opportunity by Defendants while physically present in California, which

27                will be afforded a remedy under applicable California laws;

28            c.    An Indiana Class, consisting of all Drivers who physically signed the

**CLASS ACTION COMPLAINT**

Lease Agreement and Contractor Agreement in Indiana, which will be afforded a remedy under applicable Indiana laws;

    d.  A Telemarketing Act Class, consisting of all Drivers whose actual damages exceed $50,000 and that were recruited by Defendants via more than one interstate phone call, which will be afforded a remedy under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101- 6108 and the Federal Trade Commission's Telemarketing Sales Rules ("TSR"), 16 C.F.R. Part 310.

71.    This case may be appropriately maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because all of the prerequisites set forth under Rule 23 (a) are met.

72.    To the extent required in this federal action, this case may be appropriately maintained as a class action under the Utah Consumer Sales Practices Act because all of the prerequisites set forth in Utah Code 13-11-20 are met.

73.    Members of the Class are so numerous that joinder of all such members is impracticable if not impossible. Although the exact size of the Class is unknown, it is believed and alleged that the number of persons that have worked as Drivers for ENGLAND and HORIZON during the class period nationwide exceeds 5,000.

74.    There are questions of law and fact common to the Class with respect to the liability issues, relief issues, and anticipated affirmative defenses.  Common questions of law and fact predominate over questions effecting only individuals. Fed.R.Civ.P. 23 (b)(3); U.C.A. 1953 § 13-11-20 (e) (iii).  Specifically, common issues include, but are not limited to,

    a.  Whether ENGLAND and HORIZON unlawfully sold (and sell) franchises in violation applicable federal, California, and Utah laws;

    b.  Whether ENGLAND and HORIZON unlawfully sold (and sell) business opportunities in violation applicable federal, California, Utah and Indiana laws;

    c.  Whether ENGLAND and HORIZON made misrepresentations and

21

concealed material facts in the sale of franchises and/or business opportunities in violation of applicable federal, California, Utah and Indiana statutes and applicable common law misrepresentation principles;

d. Whether the ENGLAND and HORIZON's conduct noted above constitute unfair competition and/or false advertising in violation of Business and Professions Code section 17200 et seq. and section 17500 et seq.;

e. Whether the ENGLAND and HORIZON's conduct were deceptive acts or practices or unconscionable acts or practices in violation of the Utah Consumer Sales Practices Act;

f. Whether the ENGLAND and HORIZON's conduct violated the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101- 6108 and the Federal Trade Commission's Telemarketing Sales Rules ("TSR"), 16 C.F.R. Part 310.

g. Whether the members of the Class sustained damages and, if so, the proper measure of such damages; and

h. Whether Defendants conduct warrants preliminary and/or permanent injunctive, declaratory, and ancillary relief.

75.    The prosecution of separate actions by Class members would create a risk of inconsistent or varying adjudications with respect to individuals that would establish incompatible standards of conduct for parties opposing the class. Fed.R.Civ.P. 23 (b)(1)(A).

76.    The prosecution of separate actions would create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, and substantially impair, or impede their ability to protect their interests. Fed.R.Civ.P. 23 (b)(1)(B).

77.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Fed.R.Civ.P. 23 (b)(3). More specifically, members of the Class have little or no interest in individually controlling the prosecution of separate actions.

CLASS ACTION COMPLAINT

1   Fed.R.Civ.P. 23(b) (3) (A).

2       78.    Roberts and McKay will fairly and adequately protect the interests of the

3   Class because they and their counsel possess the requisite resources and experience to prosecute

4   this case as a class action.

5       79.    Roberts and McKay are not aware of any other litigation concerning the

6   instant controversy already commenced. Fed.R.Civ.P. 23(b)(3)(B).

7       80.    It is desirable to concentrate the litigation of the claims in this Court because

8   ENGLAND and HORIZON do substantial amount of business in California and this district.

9   Defendants advertise and recruit heavily in this district for candidates to purchase the Driving

10  Opportunity.  This advertising is alleged to be false and misleading and the plaintiffs seek to

11  enjoin such advertising in California under California Business and Professions code sections

12  17200 and 17500.

13      81.    This action is manageable as a class action because, compared to any other

14  method such as individual interventions or the consolidation of individual actions, a class action

15  is more fair and efficient. Fed.R.Civ.P. 23(b) (3) (D).

16      82.    Roberts and McKay know of no difficulty that will be encountered in the

17  management of this litigation that would preclude its maintenance as a class action. The names

18  and addresses of the Class are available from ENGLAND and HORIZON. Roberts and McKay

19  contemplate providing a notice or notices to the Class, as approved by the Court, to be delivered

20  through the United States mail or as otherwise directed. The notice or notices shall, among other

21  things, advise the Class that they shall be entitled to "opt out" of the Class if they so request by a

22  date specified within the notice, and that any judgment, whether favorable or not, entered in this

23  case will bind all class members except those who affirmatively exclude themselves by timely

24  opting out.

### FIRST CLAIM FOR RELIEF
**(Violation of the California Franchise Investment Law)**
**(Roberts, McKay, California Class vs. Defendants)**

    83.    Plaintiffs incorporate by reference Paragraphs 1- 81 of this Complaint.

1      84.    Since at least 2007 to the present, ENGLAND and HORIZON have been

2  offering franchises to the public in California and selling franchises to the California Class.

3  ENGLAND and HORIZON were and are franchisors under California law and federal law.

4      85.    In or about July and September 2009, ENGLAND and HORIZON offered

5  and sold McKay and Roberts, respectively, the Driving Opportunity, which constituted a

6  franchise under the California Franchise Investment Law, Cal. Corp. Code § 31000 et seq.

7      86.    Defendants charged, and Roberts, McKay, and the California Class paid

8  Defendants, direct and/or indirect fees for the right to purchase the Driving Opportunity.

9  Specifically, the Drivers paid the Defendants fees for training, truck rental, computer rental,

10  operational equipment, insurance, signs, maintenance, gas, promotional materials and other

11  items for the right to enter the Driving Opportunity.

12      87.    ENGLAND and HORIZON gave Roberts, McKay, and those similarly

13  situated the right to engage in the Driving Opportunity under a marketing plan and/or system

14  prescribed in substantial part by ENGLAND and HORIZON.  Defendants told the Drivers in the

15  Guide and other written materials that Defendants provided such a plan and/or system and

16  stated, among other things, that Defendants provided a "[s]uccessful business plan with

17  mentoring and support staff" and "we are excited to help your business make money" and "[d]o

18  you have experience pricing, selling, and/or booking your own freight? For many the answer to

19  that question is 'no.' The staff at C.R. England consists of experienced load planners and

20  bookers who can provide various options to get the maximum length of haul. Your Driver

21  Managers (DM) works with theses groups to get the right mix of freight to meet your needs."

22  The Guide's table of contents shows the various aspects of the marketing plan and/or system

23  Defendants provided the Drivers and is attached hereto as Exhibit C and hereby incorporated by

24  reference.

25      88.    The purchase and operation of the Driving Opportunity was substantially

26  associated with the trademarks, service marks, trade name, logotype, advertising or other

27  commercial symbols designating C.R. England.

28      89.    ENGLAND and HORIZON willfully failed to register the franchise offer

with the California Commissioner of Corporations before, at the time of, and after the offer and sale of the Driving Opportunity to Roberts, McKay, and the California Class. California Corporations Code section 31300 provides that a franchisee may seek damages and rescission in such circumstances. Had Defendants registered the Driving Opportunity and otherwise complied with the California Franchise Investment Law, the Drivers would have had information about the Driving Opportunity and would not have purchased it.

90.     In addition to failing to register the franchise, ENGLAND and HORIZON have not made the required disclosures to Roberts, McKay, and the California Class at any time prior to the filing of the Complaint herein. Defendants' conduct was willful. California Corporations Code section 31300 provides that a franchisee may seek damages and rescission in such circumstances. Had Defendants provided the required disclosures, the Drivers would have had information about the Driving Opportunity and would not have purchased it.

91.     Under California Corporations Code section 31201 it is unlawful to offer or to sell a franchise in California by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants made the written and oral representations noted in paragraphs 29-32, 38, 39, 45, 47, and 49-51 to Roberts, McKay and the California Class and such were untrue statements of material fact and/or were misleading in light of the concealed material facts noted therein and in paragraphs 33, 40, 48, 49, 51, 62, and 63. These representations and omissions were intended by Defendants to induce Roberts, McKay, and the California Class to purchase the Driving Opportunity.

92.     Roberts, McKay and the California Class relied on the Defendants' false and/or misleading representations and material omissions and purchased the Driving Opportunity and paid substantial sums to Defendants.

93.     ENGLAND and HORIZON willfully or otherwise made (and continue to make) false and unlawful financial performance representations (as defined in 16 C.F.R. § 436.1 (e)) in the sale of franchises to the California Class and the public. Financial performance

25

1   representations are unlawful if they are not included in a registered disclosure document, are not

2   prepared in accordance with generally accepted accounting principles, and do not satisfy other

3   requirements of the FTC Franchise Rule and California law.

4          94.    ENGLAND and HORIZON currently makes the false and unlawful financial

5   performance representations noted above in paragraphs 32, 38, 39, 47, and 49 to the public and

6   those attending their driving schools.   Defendants made substantially similar false and unlawful

7   financial performance representations to Roberts, McKay, and the California Class during the

8   period 2007 to the present.

9          95.    ENGLAND's and HORIZON's violations of the California Franchise

10  Investment Law and as described above proximately caused Roberts, McKay, and the California

11  Class damages in that they and members of the class could not properly evaluate the nature of

12  the Driving Opportunity and purchased it based on false and/or misleading representations,

13  omissions of material fact, and unlawful financial performance representations.

14         96.    Had the Defendant provided Roberts, McKay, and the California Class the

15  true facts and not concealed material facts the Drivers would not have purchased the Driving

16  Opportunity.

17         97.    Defendants' fraudulent conduct and statutory violations harmed Roberts,

18  McKay, and the California Class entitling them to compensatory damages, rescission,

19  restitution, costs, available attorney fee's, and ancillary relief according to proof.  Roberts,

20  McKay, and the California Class were damaged in an amount to be determined at trial but that is

21  believed to exceed the jurisdictional minimum of $5,000,000 and consisting, without limitation,

22  all payments made by them to ENGLAND and HORIZON in the course of the Driving

23  Opportunity and the value of the Drivers' labor in providing services to Defendants.

24         98.    Defendants acted with oppression, fraud, and malice, and in conscious

25  disregard of the rights of Roberts, McKay, and the California Class entitling them to exemplary

26  damages in an amount according to proof.

27         WHEREFORE, Plaintiffs pray for judgment as set forth below.

28

26

**SECOND CLAIM FOR RELIEF**
**(Violation of The California Seller Assisted Marketing Plan Act)**
**(Roberts, McKay, California Class vs. Defendants)**

99.     Plaintiffs incorporate by reference Paragraphs 1- 81 of this Complaint.

100.    The Driving Opportunity meets the definitions of a "seller assisted marketing plan" under the California Seller Assisted Marketing Plan Act, Cal. Civ: Code §§ 1812.200 et seq. and did not qualify for any exemptions thereunder.  Specifically, the Driving Opportunity involved Defendants' sale or lease of product, equipment, supplies, and services for initial payment exceeding $500 to Roberts, McKay, and the California Class in connection with or incidental to beginning, maintaining, or operating the Driving Opportunity.

101.    Defendants advertised and otherwise solicited the purchase or lease of product, equipment, supplies, and services to Roberts, McKay, and the California Class as noted above in paragraphs 27-67.

102.    Defendants represented to Roberts, McKay, and the California Class that they would earn, were likely to earn, or could earn an amount in excess of the initial payment paid by them for participation in the Driving Opportunity.

103.    Defendants represented to Roberts, McKay, and the California Class that there was a market for the services provided by the Driving Opportunity.

104.    Defendants are sellers of "Seller Assisted Marketing Plans", as defined in California Civil Code section 1812.201 (d) and represented and/or implied to the Roberts, McKay, and the California Class that Defendants had sold at least five Driving Opportunities in the 24 months prior to the solicitations.  Defendants had in fact sold such Driving Opportunities and intended to, represented, and/or implied to Roberts, McKay, and the California Class that Defendants would sell at least five Driving Opportunities in the 12 months following the solicitations.

105.    The Defendants did not provide Roberts, McKay, and the California Class a Disclosure Document or an Information Sheet as required by Cal. Civ. Code §§ 1812.205 and

27

1812.206. Furthermore, the Driving Opportunity contracts (i.e. the Contractor Agreement and Lease Agreement) did not meet the substantive requirements of Cal. Civ. Code § 1812.209. Nor was the Driving Opportunity registered in California as required by Cal. Civ. Code § 1812.203.

106.    As more fully alleged in paragraphs 27-65, Defendants made earnings and market representations to Roberts, McKay, and the California Class without the substantiating data or disclosures required by Cal. Civ. Code § 1812.204. The representations were fraudulent in violation of Cal. Civ. Code §§ 1812.201 and 1812.204.

107.    The Defendants' sale of an unregistered "Seller Assisted Marketing Plan" in the state of California entitles Roberts, McKay, and the California Class to their actual damages, attorneys' fees, rescission of the Agreement, and punitive damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

108.    The Defendants' disclosure violations entitles Roberts, McKay, and the California Class to their actual damages, attorneys' fees, rescission of the Agreement, and punitive damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

109.    The Defendants' anti-fraud violations entitles Roberts, McKay, and the California Class to recover their damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
**(Violation of the California Unfair Competition Law)**
**(Roberts, McKay, California Class vs. Defendants)**

110.    Plaintiffs incorporate by reference Paragraphs 1- 108 of this Complaint.

111.    California Business and Professions Code Section 17200 et seq. prohibits "unfair competition" defined as five categories of conduct: "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

112.    Defendants' acts and practices alleged herein violate Section 17200, et seq. in

28

the following respects:

## Count I - Unregistered Franchise

113.    Defendants unlawfully offered and sold unregistered franchises to the California Class. The foregoing offers and sales violated the California Franchise Investment Law, California Corporations Code Sections 31110 and 31125 and the FTC Franchise Rule, 16 C.F. R. §§ 436.1 et seq. Consequently, the Defendants' practice of offering and selling unregistered franchises constitutes an unlawful business act or practice.

114.    Defendants' failure to register the Driving Opportunity as a franchise deprived Roberts, McKay and the California Class of the benefits of registration and they were misled by the omissions. Consequently, the Defendants' practice of offering and selling unregistered franchises constitutes a fraudulent business act or practice.

115.    The harm to the Roberts, McKay and the California Class outweighs the utility of Defendants' policies, practices, and acts alleged herein. Consequently, the Defendants' practice of offering and selling unregistered franchises constitutes an unfair business act or practice.

## Count  II – Failure to Provide Franchise Disclosure Document

116.    Defendants offered and sold franchises to the California Class but did not provide an Franchise Disclosure Document (FDD) offering circular to them as it was required to do under California Corporations Code section 31119, the California Administrative Code sections 310.11 (b) and 310.114.1, and the FTC Franchise Rule 16 C.F. R. §§ 436.1 (a) - (g) as further defined in 16 C.F. R. § 436.2 (g) (k) and (n). Further, pursuant to Section 18 (d) (3) of the FTC Act, 15 U.S.C. §  57 a (d) (3), and 16 C.F.R.  §  436.1, violations of the Franchise Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5 (a) of the FTC Act, 15 U.S.C. §  45 (a).

117.    Defendants failed to comply with FTC Franchise Rule 16 C.F.R. § 436.1 (and therefore, also, California Administrative Code sections 310.11 (b) and 310.114.1) that requires that certain accurate information be in the franchise disclosure documents, including

CLASS ACTION COMPLAINT

1  background information on the principals of the company, litigation information, truthful

2  financial performance information, and lists of previous purchasers. Defendants violated 16

3  C.F.R. § 436.1 (a) (16) (iii) by failing to disclose previous purchasers of their business

4  opportunity. Defendants violated sections 436.1 (b) and (c) by never providing substantiation

5  for the earnings claims they made to the Drivers in the website, the Guide, and pro formas.

6  Defendants violated § 436.1 (e) (3) by never providing Drivers with the number and percentage

7  of purchasers known to have achieved the same or better sales results from the Driving

8  Opportunity as those claimed in website advertisements and elsewhere.

9       118.   Consequently, the Defendants' practice of offering and selling franchises but

10  failing to provide the required disclosure documents and information constitutes an unlawful

11  business act or practice.

12       119.   Without receiving the requisite disclosure documents and information,

13  Roberts, McKay, and the California Class were likely to be and were misled. Consequently, the

14  Defendants' practice of offering and selling franchises but failing to provide the required

15  disclosure documents and information constitutes a fraudulent business act or practice.

16       120.   The harm to Roberts, McKay, and the California Class outweighs the utility

17  of Defendants' policies, practices, and acts alleged herein. Consequently, the Defendants'

18  practice of offering and selling franchises without providing the requisite disclosure documents

19  and information constitutes an unfair business act or practice.

20

21

### Count III – Seller Assisted Marketing Plan Act Violations

22       121.   Defendants unlawfully offered and sold unregistered seller assisted marketing

23  plans to Roberts, McKay, and the California Class as noted in paragraphs 99 to 108.

24  Consequently, the Defendants' practice of offering and selling unregistered seller assisted

25  marketing plans constitutes an unlawful business act or practice.

26       122.   Defendants' failure to register the Driving Opportunity as a franchise

27  deprived Roberts, McKay and the California Class of the benefits of registration and they were

28  misled by the omission. Consequently, the Defendants' practice of offering and selling

CLASS ACTION COMPLAINT

1    unregistered seller assisted marketing plans constitutes a fraudulent business act or practice.

2        123.    The harm to the California Class outweighs the utility of Defendants'

3    policies, practices, and acts alleged herein.  Consequently, the Defendants' practice of offering

4    and selling unregistered seller assisted marketing plans constitutes an unfair business act or

5    practice.

6        124.    Defendants' failure to provide Roberts, McKay and the California Class the

7    required seller assisted marketing plans disclosure documents constituted unlawful, fraudulent,

8    and unfair business acts or practices.

9        125.    Defendants' failure to provide Roberts, McKay and the California Class the

10    required seller assisted marketing plan contract terms constitute unlawful, fraudulent, and unfair

11    business acts or practices.

12        126.    Defendants' violation of the Seller Assisted Marketing Plan Act's anti-fraud

13    provisions constitutes unlawful, fraudulent, and unfair business acts or practices.

14

15    **Count IV – The Fraud Scheme**

16        127.    Defendants sold the Driving Opportunity to Roberts, McKay, and the

17    California Class via uniform scripted presentations in the Guide and other uniform

18    communications that misrepresented facts, misled, and concealed material information as

19    described above in paragraphs 27-63.

20        128.    Defendants unlawfully baited the California Class into paying for and

21    attending its truck driving school with false promises of guaranteed employment only to later

22    switch them to and demand that they purchase the Driving Opportunity.   Defendants utilized a

23    variety of fraudulent and manipulated techniques to induce the Roberts, McKay and the

24    California Class into purchasing the Driving Opportunity as noted in paragraphs 45-51.

25        129.    Defendants concealed the fact that almost all Drivers fail within a year or two

26    and none make anything close to the income Defendants' represented.

27        130.    Defendants' conduct violated Section 5 (a) of the FTC Act, 15 U.S.C. §

28    45(a), that provides that "unfair or deceptive acts or practices in or affecting commerce are

31

1  hereby declared unlawful." Defendants' representations and omissions were false or misleading

2  and constitute deceptive acts or practices in violation of Section 5 (a) of the FTC Act, 15 U.S.C.

3  § 45 (a). Consequently, Defendants conduct was unlawful, fraudulent, and unfair.

4        131.  The Defendants' noted conduct violated the CFIL and provisions prohibiting

5  fraud, misleading statements, and omissions of material fact in the sale of a franchise.

6  Consequently, Defendants conduct was unlawful, fraudulent, and unfair.

7        132.  The Defendants' noted conduct violated the SAMP Act and provisions

8  prohibiting fraud, misleading statements, and omissions of material fact in the sale of a SAMP.

9  Consequently, Defendants conduct was unlawful, fraudulent, and unfair.

10        133.  The Defendants' conduct in communicating deceptive endorsements in the

11  Guide violated 16 C.FR. § 255.0 et seq. prohibiting misleading, deceptive, and/or distorted

12  endorsements. Consequently, Defendants conduct was unlawful, fraudulent, and unfair.

13        134.  The bait of "guaranteed employment" and switch to the Driving Opportunity

14  was a deceptive act and practice.   Consequently, Defendants conduct was fraudulent, and

15  unfair.

16        135.  Defendants' conduct otherwise constituted fraudulent business practices in

17  that Plaintiffs were likely to be deceived (and were deceived) into purchasing training,

18  franchises and/or seller assisted marketing plans.

19        136.  On information and belief, Defendants received reimbursement from the

20  United States government for student tuition.  Given the fraud scheme described in this

21  complaint, such moneys should be disgorged and returned to the United States government.

22        137.  Advertising is virtually any statement made in connection with the sale of

23  goods or services. Defendants' fraud scheme, its websites, the Guide, and the other conduct

24  therein in marketing the franchises was advertising and was unfair, deceptive, false and/or

25  misleading as noted in detail paragraphs 4-8 and 27-63.

26        138.  The fifth prong of § 17200 liability makes certain other acts automatic

27  violations ("any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of

28  Division 7 of the Business and Professions Code"). Defendants' false and misleading

advertising violates section 17500. To the extent that such advertising included misleading claims or other facts, it also violates section 17508. Further, Defendants' use of the misleading endorsements is also prohibited by section 17500.

139.   Defendants' conduct caused Plaintiffs to suffer injury in fact including losses suffered by the California Class in paying money to Defendants for tuition for training, truck lease payments, gas, insurance, maintenance, equipment leases and other fees.

140.   Defendants' unfair competition presents a continuing threat to Plaintiffs and to members of the public in that Defendants will persist in these practices until preliminary and permanent injunctions are issued by this Court.

141.   Defendants have been unjustly enriched and have otherwise received revenues and labor that should be restored and disgorged to the extent allowed by law.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### FOURTH CLAIM FOR RELIEF
**(Violation of the Utah Consumer Sales Practices Act)**
**(Roberts, McKay, and Nationwide and Utah Classes vs. Defendants)**

142.   Plaintiffs incorporate by reference Paragraphs 1- 81 of this complaint.

143.   Defendants' conduct noted above in paragraphs 3-10 and 27-63 constitutes deceptive acts or practices in connection with a consumer transaction under Utah Code § 13-11-1 *et seq*. Defendants conduct in perpetrating the described fraudulent scheme against the Nationwide Class was at all material times developed, orchestrated, and implemented in part out of its headquarters in Utah by their senior management. In addition, the actual execution of the Contractor Agreement and Lease Agreement contracts by Roberts, McKay, and the Utah Class took place in Utah.

144.   The Utah Consumer Sales Practice Act is intended not only to protect consumers but also protect law-abiding competitors and, as much as possible, conform Utah state law to policies of the Federal Trade Commission Act.

145.   The Driving Opportunity satisfies the definition of a consumer transaction in

33

that it required the Roberts, McKay, and Nationwide Class to expend money and personal services on a continuing basis for ENGLAND and HORIZON and was one in which they had not previously been engaged.

146.    As noted above paragraphs 3-10 and 27-63, the Defendants knowingly or intentionally represented to the Roberts, McKay, and the Nationwide and Utah Classes that the Driving Opportunity Defendants offered for sale had performance characteristics, uses, benefits, and qualities that the Driving Opportunity did not.  Defendants made the written and oral representations noted in paragraphs 29-32, 38, 39, 45, 47, and 49-51 to Roberts, McKay and the California Class and such were untrue statements of material fact and/or were misleading in light of the concealed material facts noted therein and in paragraphs 33, 40, 48, 49, 51, 62, and 63.  This conduct is ongoing as Defendants false and misleading representations continue unabated to this day.

147.    The Defendants also in the following conduct that constitutes unconscionable acts or practices in connection with a consumer transaction:

      a.  misrepresenting and concealing material information in the sale of the Driving Opportunity;

      b.  baiting consumers with promises of guaranteed employment and the switching them into purchasing a business opportunity;

      c.  failing to provide disclosures required by the FTC franchise rule and the applicable business opportunity statute;

      d.  entering into and enforcing the terms and conditions of the illegal contracts and accepting the benefits conferred by Drivers

148.    The Defendants also engaged in the following conduct that constitutes deceptive acts or practices or unconscionable acts or practices in violation of the Act pursuant to rules adopted by the Utah Department of Commerce, Division of Consumer Protection in Rule 152-11 in the establishment of a franchise or distributorship (which the Driving Opportunity is) in connection with a consumer transaction:

      a.  Misrepresenting the prospects or chances for success of a proposed or

34

existing franchise or distributorship as noted in detail in paragraphs 29-32, 38, 39, 45, 47, and 49-51 to and concealing material facts noted therein and in paragraphs 33, 40, 48, 49, 51, 62, and 63 and concealing the almost certain failure of those purchasing the Driving Opportunity; and

    b.  Misrepresenting the amount of profits, net or gross, the franchisee can expect from the operation of the franchise or distributorship as noted in paragraphs 27-63;

149.    If not for ENGLAND's and HORIZON's deceptive acts or practices or unconscionable acts or practices in violation of the Act, Roberts, McKay, the Nationwide and Utah Classes would not have paid for the Driving Opportunity.

150.    Roberts, McKay, the Nationwide and Utah Classes are entitled to recover their damages caused by Defendants violations of Utah Code § 13-11-1 *et seq* pursuant to Utah Code § 13-11-19 (2) and (4).

151.    Roberts, McKay, the Nationwide and Utah Classes are entitled to a declaratory judgment that Defendants' acts and practices described herein violate Utah Code § 13-11-1 *et seq* pursuant to Utah Code § 13-11-19 (1) (a) and (3).

152.    Roberts, McKay, and the Nationwide and Utah Classes are entitled to an injunction and appropriate ancillary relief under Utah Code § 13-11-19 (1) (b) and (3). Defendants' acts and practices described herein violate Utah Code § 13-11-1 *et seq*.

153.    Roberts, McKay, and the Nationwide and Utah Classes are entitled to an award of attorney's fees under Utah Code § 13-11-19 (5).

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Utah Business Opportunity Disclosure Act)
### (Roberts, McKay, Nationwide and Utah Classes vs. Defendants)

154.    Plaintiffs incorporate by reference Paragraphs 1- 81 of this complaint.

155.    The Driving Opportunity meets the definitions of "business opportunity" and

35

1  an "assisted marketing plan" under the Utah Business Opportunity Disclosure Act, Utah Code

2  Ann. § 13-15- 1, et seq and did not qualify for any exemptions thereunder.  Specifically, the

3  Driving Opportunity involved ENGLAND's and HORIZON's  sale or lease of product,

4  equipment, supplies, and services for consideration of $300 or more to Roberts, McKay, and the

5  Nationwide and Utah Classes to enable them to start a business.  Further, ENGLAND and

6  HORIZON  represented to the Roberts, the Nationwide and Utah Classes that they would

7  provide a sales program and marketing plan (for example, as noted above in paragraphs 29, 38-

8  39, 45, 47-51) that would enable Roberts, McKay, the Nationwide and Utah Classes to derive

9  income exceeding the purchase price paid.

10      156.    Defendants are sellers of "Assisted Marketing Plans", as defined in the Utah

11  Business Opportunity Disclosure Act, Utah Code Ann. § 13-15- 1, et seq.

12      157.    Defendants have not and never have complied with the registration and

13  disclosure requirements for offering such plans.

14      158.    Roberts', McKay's, and the Nationwide and Utah Classes' consent to the

15  Driving Opportunity, if any, was obtained through Defendants' failure to comply with the Utah

16  statutory requirements.

17      159.    Roberts, McKay, and the Nationwide and Utah Classes are entitled rescission

18  and damages from Defendants, including, but not limited to, all monies paid to Defendants as

19  provided for in Utah Code § 13-15-6 (2).

20      160.    Roberts, McKay, and the Nationwide and Utah Class are entitled reasonable

21  attorney's fees and court costs from Defendants under Utah Code § 13-15-6(2).

22      WHEREFORE, Plaintiffs pray for judgment as set forth below.

23

24      **FIFTH CLAIM FOR RELIEF**
        **(Violation of the Indiana Business Opportunity Transactions Law)**

25      **(Roberts and McKay On Behalf of the Indiana Class vs. Defendants)**

26      161.    Plaintiffs incorporate by reference Paragraphs 1- 81 of this complaint.

27      162.    The Driving Opportunity meets the definitions of "business opportunity"

28

36

1  under the Indiana Business Opportunity Transactions Act, IC 24-5-8-1, and did not qualify for

2  any exemptions thereunder.  Specifically, the Driving Opportunity involved ENGLAND's and

3  HORIZON's  sale or lease of product, equipment, supplies, and services for initial payment of

4  more than $500 paid to them by the Indiana Class to enable them to start a business.  Further,

5  ENGLAND and HORIZON represented to the Indiana Class that they would provide a sales

6  program and/or marketing plan (for example, as noted above in paragraphs 29, 38-39, 45, 47-

7  51) that would enable the Indiana Class to derive income from the exceeding the purchase price

8  paid and the Indiana Class relied on such representations.

9     163.    Defendants are "sellers" of "business opportunities" as defined in the Indiana

10  Business Opportunity Transactions Act, IC 24-5-8-1.

11     164.    Defendants have not complied with the registration and disclosure

12  requirements for offering such plans under Indiana law.

13     165.    The Indiana Classes' consent to the Driving Opportunity, if any, was

14  obtained through Defendants' failure to comply with the Indiana Business Opportunity

15  Transactions Act, IC 24-5-8-1 et seq.

16     166.    The Indiana Class is entitled to rescission and damages from Defendants,

17  including, but not limited to, all monies paid to Defendants as provided for Indiana Business

18  Opportunity Transactions Act, IC 24-5-8-16 and 17.

19     167.    The Indiana Class is entitled to reasonable attorney's fees and court costs

20  from Defendants under Indiana Business Opportunity Transactions Act, IC 24-5-8-17.

21     168.    The Indiana Class is entitled to an injunctive relief under Indiana Business

22  Opportunity Transactions Act, IC 24-5-8-18.

23     WHEREFORE, Plaintiffs pray for judgment as set forth below.

24

25             **SIXTH CLAIM FOR RELIEF**

26  **(Violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act)**
    **(Roberts and The Telemarketing Class vs. Defendants)**

27

28     169.    Plaintiffs incorporate by reference Paragraphs 1-81 of this complaint.

37

170.    The Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. §6101 et seq., authorized the Federal Trade Commission to prescribe rules (Telemarketing Sales Rules or TSR) to prevent deceptive and abusive telemarketing practices.

171.    15 U.S.C. § 6102(a)(2) provides that "[t]he Commission shall include in such rules respecting deceptive telemarketing acts or practices a definition of deceptive telemarketing acts or practices . . . which may include acts or practices of entities or individuals that assist or facilitate deceptive telemarketing . . . ." The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

172.    Defendants initiate outbound telephone calls to consumers in the United States to induce the purchase of goods or services including those affiliated with their truck driving schools and the Driving Opportunity and related good and services.  Defendants are "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

173.    Since at least 2008, Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of truck driving training, the Driving Opportunity, and related goods and services to by use of one or more telephones and which involves more than one interstate telephone call.  As noted above in paragraphs 34 and 35, Roberts received two or more such calls.

174.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, material aspects of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3 (a) (2) (iii).

175.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any "investment opportunity" including, but not limited to, risk, liquidity, earnings potential, or profitability.  16 CFR § 310.3 (a)(2)(vi).  Investment opportunity means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation. 16 CFR § 310.2

38

(q).

176.   Defendants' truck driving school, the Driving Opportunity, and the related goods and services, constitute goods, services, and an investment opportunity under the TSR.

177.   Defendants misrepresented, directly and/or by implication the efficacy of the school, Driving Opportunity, and the related goods and services by, among other things, making false, fraudulent, and misleading claims that Roberts and others similarly situated:

   a.   would receive guaranteed jobs on completion of the school

   b.   would earn income in the amount of money Defendants' other drivers had made and as otherwise represented on the ENGLAND website and elsewhere;

   c.   Defendants concealed that ENGLAND had no guaranteed jobs for candidates it enrolled in its school and concealed that it would engage and had for years engaged in a bait and switch scheme.

   d.   Defendants concealing that the almost all Drivers failed, ended up returning their trucks to Defendants, ended up in debt to Defendants, and could not earn any net profit or income and instead worked for free;

178.   For the same reasons described in paragraphs 176, Defendants misrepresented, directly or by implication, the risk involved, the earnings potential, or profitability associated with the training and Driving Opportunity.

179.   The TCFAPA, 15 U.S.C. §6104(a), permits any person "adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission" to bring an action for damages and/or to enjoin such conduct if the amount in controversy "exceeds the sum or value of $50,000 in actual damages."

180.   Roberts and each member the Telemarketing Class have suffered in excess of $50,000 in actual damages as a result of Defendants unlawful pattern and practice of telemarketing that violated the Commissions' rules.

181.   Roberts are the Telemarketing Class are entitled to damages, attorney's fees, expert witness fees, costs of suit, and injunctive relief.

39

WHEREFORE, Plaintiffs pray for judgment as set forth below.

### SEVENTH CLAIM FOR RELIEF
#### (Common Law Fraud And/Or Negligent Misrepresentation)
#### (Roberts, McKay, Indiana and Utah Classes vs. Defendants)

182.   Roberts incorporates by reference Paragraphs 1- 81 of this complaint.

183.   Prior to purchasing the Driving Opportunity by entering the Lease Agreement and Contractor Agreement with Drivers in either Utah or Indiana, Defendants intentionally made misrepresentations of material facts and concealed true material and qualifying facts as noted in paragraphs 4, and 27-63.

184.   The Defendants false representations concerned then existing material facts.

185.   Defendants' made these misrepresentations and omissions with the intent to induce the Drivers to rely on them and to purchase training, the Driving Opportunity, and enter into the Lease Agreement and Contractor Agreement.

186.   As to the Utah Class, if the above misrepresentations were not made intentionally, then they were made negligently by Defendants without regard to their truth and falsity and constitute negligent misrepresentation.

187.   When Defendants chose to speak and make the various representations on the subject matter of the Driving Opportunity, they were duty bound to disclose all qualifying materials facts such as those described in paragraph 62 above.  Defendants did not disclose the material facts to the Drivers but instead concealed them.

188.   The Drivers were ignorant of the falsity of Defendants' misrepresentations and could not in the exercise of reasonable diligence have discovered Defendants' misrepresentations and omissions because only Defendants possessed that information.

189.   In justified reliance on Defendants' representations and omissions, the Drivers purchased the Driving Opportunity and entered into the Contractor Agreement and Lease Agreement and paid substantial sums to Defendants.  Had the Drivers known of the falsity of Defendants' representations or known of the omitted material facts, they would not have entered into the subject contracts.

190.    As a direct and proximate result of Defendants' fraud, the Drivers were damaged by paying money to and expending labor for Defendants. The Drivers are entitled to damages in a sum not yet fully ascertained but in excess of the jurisdictional minimum of this court. Alternatively, the Drivers are entitled to rescission of the subject contracts, restitution, and ancillary damages according to proof.

191.    Defendants acted with oppression, fraud, and malice, and in conscious disregard of the Drivers' rights entitling the Drivers to exemplary damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Roberts, McKay, Indiana and Utah Classes vs. Defendants)

192.    Plaintiffs incorporate by reference Paragraphs 1- 81 of this Complaint.

193.    As a result of Defendants' wrongful and fraudulent conduct, Roberts, McKay, and all of the Drivers have conferred benefits upon Defendants.

194.    Defendants were at all relevant times aware that the benefits conferred upon them by the Drivers were the result of fraud and misrepresentation.

195.    Allowing Defendants to retain these unjust profits and other benefits would offend traditional notions of justice and fair play.

196.    Under these circumstances, it would be inequitable for Defendants to retain the benefits and allowing them to do so would induce companies to make misrepresentations to increase sales.

197.    Defendants are in possession of funds that were wrongfully obtained from Drivers and such funds should be disgorged as ill-gotten gains.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## EIGHTH CLAIM FOR RELIEF
### (Declaratory Relief)
### (Roberts, McKay, and All Classes vs. Defendants)

198.    Plaintiffs incorporate all other allegations in this Complaint.

41

199.    An actual controversy now exists between Roberts, McKay, and those similarly situated (Plaintiffs) on one hand and Defendants on the other hand concerning their respective rights and obligations under the Lease Agreement and Contractor Agreement:

      a.  Plaintiffs contend that they are Defendants' franchisees whereas the Defendants contend to the contrary.

      b.  Plaintiffs contend that the contractual limitations, choice of law, and choice of forum, are unenforceable, in derogation of statutory provisions (unwaivable or otherwise) and public policy, and are unconscionable whereas the Defendants contend to the contrary.

200.    Such declarations are necessary and appropriate at this time so that the parties may ascertain their respective rights in obligations.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## **PRAYER**

WHEREFORE, Roberts prays for JUDGMENT against Defendants as follows:

1.  For a determination that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

2.  For damages, rescission, and restitution to Roberts, McKay, and the Drivers and disgorgement of any moneys found owing to federal or state governments.

3.  For a finding that Defendants violated, and continue to violate federal, California, Utah, and Indiana franchise laws and/or business opportunity laws and/or consumer protection and false advertising laws and for an appropriate damage and/or restitution award.

4.  For compensatory damages in a sum not less than the jurisdictional minimum of this Court in an amount to be proven.

5.  For exemplary damages against each Defendant.

6.  For a declaration of the respective rights and obligations between Roberts and those similarly situated on the one hand and Defendants on the other under and related to the

42

1   franchise agreements.

2   7.  For an injunction prohibiting Defendants' the sale of unregistered franchises and business

3       opportunities and misleading advertising.

4   8.  For interest according to law.

5   9.  For attorney's fees and costs of suit under applicable law; and

6   10. For such other relief as the Court deems just and equitable.

7

8   Dated: May 27, 2011                        Lagarias & Boulter L.L.P.

9

10

11                                             Robert S. Boulter
                                               Attorneys for Charles Roberts
12

13                              **DEMAND FOR JURY TRIAL**

14          Plaintiffs, on behalf of themselves and others similarly situated, demand a jury trial in this

15  action.

16  Dated: May 27, 2011                        Lagarias & Boulter L.L.P.

17

18

19                                             Robert S. Boulter
                                               Attorneys for Charles Roberts and Kenneth
20                                             McKay

21

22

23

24

25

26

27

28

43