UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHARLES ROBERTS; and KENNETH MCKAY, on behalf of themselves and others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>C.R. ENGLAND, INC.; OPPORTUNITY LEASING, INC.,<br><br>      Defendants. | **JOINT STIPULATION OF CLASS ACTION SETTLEMENT AND RELEASE**<br><br>Civil No. 2:12-CV-00302 RJS<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Brooke C. Wells |

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release ("Agreement"), dated as of November 16, 2018, is entered into by and between plaintiff Kenneth McKay ("McKay"), on behalf of himself and the Class (as defined below) (collectively, "Plaintiffs"), and defendants C.R. England, Inc. ("C.R. England") and Opportunity Leasing, Inc. (collectively, "Defendants"; and together with Plaintiffs, the "Parties") by and through their respective counsel.

## RECITALS

WHEREAS, on May 27, 2011, plaintiffs McKay and Charles Roberts ("Roberts") filed a putative class action against Defendants in the United States District Court for the Northern District of California on behalf of themselves and a putative nationwide class concerning certain alleged statements and omissions regarding Defendants' independent contractor lease operator driver program.   On March 29, 2012, the action was transferred to the United States District Court for the District of Utah.   *See Roberts, et al. v. C.R. England, et al.*, Case No. 2:12-CV-00302-RJS-BCW (D. Utah) (the "Action");

WHEREAS, Roberts previously served in the role of plaintiff and class representative in the Action, but he is no longer serving in that role because he passed away and his estate has elected not to actively participate in the litigation;

WHEREAS, Plaintiffs make various claims, contentions, and allegations against Defendants and seek statutory damages, compensatory damages, exemplary damages, restitution, disgorgement, rescission, and/or injunctive relief;

WHEREAS, the Parties engaged in numerous settlement discussions with the assistance of Robert H. Fairbank and Kimberly West of Fairbank ADR over a twelve-month period, including full-day mediations on August 30, 2017, and August 30, 2018;

WHEREAS, the Parties reached an agreement to resolve all claims against Defendants in the Action, the material terms of which were incorporated into the Settlement Term Sheet executed by the Parties on September 21, 2018;

WHEREAS, Defendants have denied and continue to deny any wrongdoing and any liability for the Released Claims (as defined below);

WHEREAS, the Parties have agreed to settle the claims in the Action on the terms and conditions set forth in this Agreement;

WHEREAS, the Parties have agreed to enter into this Settlement (as defined below) because it provides substantial and meaningful benefits to the Class Members (as defined below) and to avoid the uncertainties and substantial expense, business disruption, further passage of time, and burden inherent in continued litigation; and

WHEREAS, entry into this Agreement is not an admission of liability by Defendants;

NOW, THEREFORE, it is agreed, by and among the undersigned, intending to be legally bound, that the Action shall be settled and dismissed with prejudice pursuant to the terms and conditions set forth herein, subject to judicial approval.

## I.      DEFINITIONS

1.1      "Action" means *Roberts et al v. C.R. England et al*, Case No. 2:12-CV-00302-RJS-BCW (D. Utah) and any existing related appeals.

1.2      "Administration Costs" shall mean (i) the costs and expenses associated with the production and dissemination of the Long Form Notice (defined below); (ii) the costs and expenses associated with the production and publication of the Published Notice (as defined below); (iii) the costs and expenses associated with the production and dissemination of the E-Mail Notice; (iv) all reasonable fees and costs incurred by the Settlement Administrator (as defined below) in administering and effectuating this Settlement, which costs and expenses are

authorized or necessitated by performance and implementation of this Agreement and any Court orders relating thereto; and (v) the costs and expenses associated with any other notices, mailings, publications, or processing required under the terms of this Agreement or any Court order.

  1.3  "Advanced Funds Debts" shall have the meaning ascribed to it in paragraph 5.1.

  1.4  "Agreement" or "Settlement Agreement" shall mean this Settlement Agreement and General Release, entered into by and between the Parties and includes the Settlement Term Sheet attached as Exhibit A hereto.

  1.5  "Attorneys' Fees and Expenses" shall mean any and all attorneys' fees, costs (including expert costs) and expenses of Class Counsel (defined below) for their past, present, and future work, efforts, and expenditures in connection with the Action and this Settlement, including fees, costs, and expenses of any co-counsel, local counsel, experts, consultants, or other individuals retained by, or who assisted, Class Counsel in connection with the Action and this Settlement.

  1.6  "Class Counsel" or "Plaintiffs' Counsel" shall mean each of Law Offices of Robert S. Boulter; Wilentz, Goldman & Spitzer, P.A.; Kravit, Hovel & Krawczyk, S.C.; Anderson & Karrenberg, P.C.; and Harper Law, PLC.

  1.7  "Class Member(s)" or "Class" shall mean any and/or all independent contractor lease operators who (i) signed both a Vehicle Lease Agreement and an Independent Contractor Operating Agreement between May 27, 2007 and January 31, 2017, (ii) drove at least one day as an independent contractor lease operator for C.R. England, and (iii) did not submit a Request for Exclusion on or before June 18, 2018.

1.8     "Class Representative Enhancement Payments" shall have the meaning ascribed

to it in paragraph 8.1.

1.9     "Class Representative" shall mean plaintiff Kenneth McKay.

1.10    "Court" shall mean the United States District Court for the District of Utah.

1.11    This space left intentionally blank.

1.12    "Defendants' Counsel" shall mean Akin Gump Strauss Hauer & Feld LLP and

Ray Quinney & Nebeker P.C.

1.13    "Defendants" shall mean C.R. England, Inc. and Opportunity Leasing, Inc.

1.14    "Distributable Settlement Amount" shall have the meaning ascribed to it in

paragraph 4.2(a).

1.15    "Effective Date" shall mean the later of (i) the expiration of the time to appeal the

Final Approval Order and Judgment with no appeal having been filed; or (ii) if such appeal is

filed, the termination of such appeal on terms that affirm the Final Approval Order and Judgment

or dismissal of the appeal with no material modification to the Final Approval Order and

Judgment, and the expiration of the time to obtain any further appellate review of the Final

Approval Order and Judgment.

1.16    "E-Mail Notice" shall have the meaning ascribed to it in paragraph 3.4.

1.17    "Enhanced Payment" shall have the meaning ascribed to it in paragraph 4.2(b).

1.18    "Escheat Amount" shall have the meaning ascribed to it in paragraph 4.3(e).

1.19    "Escrow Account" shall mean an account that is established by the Settlement

Administrator for the deposit of any amounts relating to the Settlement.

1.20    "Escrow Agent" shall mean the Settlement Administrator (as defined below), or

any other person or entity approved by the Court to act as escrow agent for any portion of the

Settlement Amount (defined below) deposited in or accruing in the Escrow Account pursuant to this Agreement.

1.21    "Escrow Taxes" shall mean taxes on the income of the Escrow Account.

1.22    "Escrow Tax-Related Costs" shall mean any and all expenses and costs incurred in connection with the taxation of the Escrow Account, including, without limitation, expenses of tax attorneys and accountants.

1.23    "Fee and Expense Application" shall mean the petition, to be filed by Class Counsel, seeking approval of an award of Attorneys' Fees and Expenses.

1.24    "Final Approval" shall mean the entry of the Final Approval Order and Judgment.

1.25    "Final Approval Hearing" shall mean the hearing to be held before the Court pursuant to Federal Rule of Civil Procedure 23(e) to determine whether the Agreement should receive Final Approval (as defined below) by the Court.   The Parties will request that the Final Approval Hearing be scheduled for a date no earlier than one hundred and fifty-five (155) days after the entry of the Preliminary Approval Order (as defined below).[1]

1.26    "Final Approval Order and Judgment" or "Final Approval Order" shall mean a final order in a form to be agreed to by the Parties and entered by the Court after the Final Approval Hearing granting its approval of the Settlement.

1.27    "First Check" shall have the meaning ascribed to it in paragraph 4.2(d).

1.28    "First Check-Cashing Deadline" shall have the meaning ascribed to it in paragraph 4.2(e).

---

[1] As used herein, the term "day" or "days" shall refer to calendar days unless otherwise specified.

1.29    "Long Form Notice" shall mean the notice of the Settlement, in a form to be agreed to by the Parties, to be sent to Class Members and available to Class Members on the Settlement Website (defined below).

1.30    "McKay" shall mean plaintiff Kenneth McKay.

1.31    "Minimum Payment" shall have the meaning ascribed to it in paragraph 4.2(b).

1.32    "Net Distributable Settlement Amount" shall have the meaning ascribed to it in paragraph 4.2(b).

1.33    "Objection" shall have the meaning ascribed to it in paragraph 3.10.

1.34    "Parties" shall mean Plaintiffs and Defendants.

1.35    "Plaintiffs" shall mean the Class, with the Class Representative acting on behalf of himself and the Class.

1.36    "Preliminary Approval Order" shall mean an order in a form to be agreed to by the Parties and entered by the Court preliminarily approving the Settlement.

1.37    "Published Notice" shall have the meaning ascribed to it in paragraph 3.5.

1.38    "Released Claims" shall mean any and all claims asserted in the Action or arising from, related to, or derivative of the claims or factual allegations asserted in the Action.   The Released Claims shall include, but are not limited to, any and all claims, rights, demands, obligations, damages, actions or causes of action, or liabilities whatsoever, of every nature and description, whether known or unknown, whether arising under federal, state, common, or foreign law or regulation, that Class Members asserted or could have asserted in the Action, or that otherwise arise from or relate to the acts, facts, statements, or omissions that were or could have been alleged or asserted by Plaintiffs in the Action, including, without limitation, claims that arise out of or relate in any way to Defendants' alleged misrepresentations or omissions, the

Class Members' independent contractor relationships with Defendants, C.R. England's buyout agreements and distributions to or involving any of the Released Parties, and any claims for damages, restitution, penalties, interest, costs, attorneys' fees, expenses, equitable relief, injunctive relief, and any other relief.

1.39   "Released Parties" shall mean each of defendants C.R. England, Inc. and Opportunity Leasing, Inc., and their present and former parents, subsidiaries, divisions, departments, affiliates, founders, owners, shareholders, officers, directors, employees, and agents (including, without limitation, Dan England, Janet England, Dean England, Todd England, and Corey England, and any trust of which any of them is a trustee or beneficiary), any of their advisors, counsel, and representatives (and the predecessors, successors, insurers, administrators, and assigns of each of the foregoing), and any other persons acting by, through, under, or in concert with any of them.

1.40   "Request for Exclusion" shall have the meaning ascribed to it in paragraph 3.9.

1.41   "Response Deadline" shall mean the deadline by which Class Members must postmark to the Settlement Administrator Requests for Exclusion or to the Court Objections to the Settlement.   The Response Deadline will be thirty-five (35) days before the Final Approval Hearing set by the Court.

1.42   "Roberts" shall mean plaintiff Charles Roberts.

1.43   "Second Check" shall have the meaning ascribed to it in paragraph 4.3(b).

1.44   "Second Check-Cashing Deadline" shall have the meaning ascribed to it in paragraph 4.3(c).

1.45   "Settlement" shall mean the compromise and settlement embodied in this Settlement Agreement.

1.46   "Settlement Administrator" shall mean A.B. Data, Ltd.

1.47   "Settlement Amount" is the cash amount of Thirty-Seven Million, Eight Hundred Thousand Dollars ($37,800,000).

1.48   "Settlement Telephone Number" shall have the meaning ascribed to it in paragraph 3.8.

1.49   "Settlement Website" shall have the meaning ascribed to it in paragraph 3.7.

## II.   NO ADMISSION OF WRONGDOING

2.1   Defendants denied, and continue to deny, all of the allegations of wrongdoing in the Action, and have denied and continue to deny all allegations of wrongdoing or liability whatsoever with respect to the Released Claims.   This Agreement, and any of its terms, any agreement or order relating thereto, and any payment or consideration provided for herein, are not and shall not be construed as an admission of the validity or infirmity of any claim against Defendants or any of the Released Parties , or of the liability or non-liability of Defendants or any of the Released Parties.   This Agreement, and any of its terms, and any agreement or order relating thereto, shall not be offered by any person or entity to be received in evidence in any civil, criminal, administrative, or other proceeding, or utilized in any manner as a presumption, a concession, or an admission of any fault, wrongdoing, or liability on the part of any Defendant. However, nothing contained in this paragraph shall prevent this Agreement (or any agreement or order relating thereto) from being used, offered, or received in evidence in any proceeding to approve, enforce, or otherwise effectuate the Settlement (or any agreement or order relating thereto) or the Preliminary or Final Approval Order and Judgment.   This Agreement may be filed and used in other proceedings, where relevant, to demonstrate the fact of its existence and of this Settlement, including, but not limited to, Released Parties filing the Agreement and/or the Final Approval Order and Judgment in any other action that may be brought against them in

order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, waiver, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

2.2     This Agreement, and any agreement or order relating thereto, shall not be deemed a bar against any Class Member from taking any position as to the validity of any claim against Defendants in any controversy with state or federal taxing authorities.

2.3     The Parties understand that there are no admissions of liability by Defendants and the Parties shall, in good faith, endeavor to communicate the terms of the Settlement in a manner that is respectful of the fact that no final adjudication of fault was determined by a court or jury, as provided in paragraphs 10.1 and 10.2 below.

**III.     MOTION FOR PRELIMINARY APPROVAL**

3.1     ***Motion for Preliminary Approval***.    As soon as is practicable after execution of this Agreement, Plaintiffs shall move the Court for preliminary approval of the Settlement, including entry of an order in a form to be agreed to by the Parties.

3.2     ***Class Certification***.    If, for any reason, the Settlement is not approved, Defendants will not be deemed to have waived or limited any objections or defenses to ongoing certification of the Class, including, without limitation, any arguments for decertification of the Class in whole or in part.

3.3     ***Long Form Notice***.    Commencing thirty (30) days after the entry of the Preliminary Approval Order and concluding no later than sixty (60) days from the entry of the Preliminary Approval Order, the Settlement Administrator shall send to all of the Class Members by first-class mail the Long Form Notice in a form to be agreed to by the Parties and submitted with the Motion for Preliminary Approval.    The Long Form Notice shall be sent to the last

known mailing address of the Class Members and updated through the National Change of Address database by the Settlement Administrator.

3.4     ***E-Mail Notice***.    Within forty-five (45) days of the entry of the Preliminary Approval Order, the Settlement Administrator shall send an e-mail to the last known e-mail address of all the Class Members for whom it has a known e-mail address containing a link to the Settlement Website generally and also a specific link to the Long Form Notice (the "E-Mail Notice"), in a form to be agreed to by the Parties and submitted with the Motion for Preliminary Approval.

3.5     ***Published Notice***.    Within sixty (60) days of the first mailing of the Long Form Notice, the Settlement Administrator shall cause notice of the Settlement to be published in Landline Magazine or an equivalent    publication, in a form to be agreed to by the Parties that provides the general details of the Settlement Agreement and directs Class Members to the Settlement Website (the "Published Notice"), where the Long Form Notice and the Settlement Agreement and its exhibits all will be available.

3.6     ***Class Action Fairness Act Notice***.    Defendants shall comply with the notice requirements of 28 U.S.C. § 1715 and shall file with the Court an appropriate notice confirming compliance prior to the Final Approval Hearing.

3.7     ***Settlement Website***.    Within thirty (30) days of the entry of the Preliminary Approval Order, the Settlement Administrator shall utilize www.crenglandclassaction.com or another website as the Settlement Website (the "Settlement Website"), which shall contain the Long Form Notice.    The Long Form Notice, the Published Notice, and the E-mail Notice shall identify the web address of the Settlement Website.

3.8     ***Settlement Telephone Number***.    Within thirty (30) days of the entry of the

Preliminary Approval Order, the Settlement Administrator shall establish and maintain an

automated, toll-free telephone line ("Settlement Telephone Number") for Class Members to

make Settlement-related inquiries.    The Settlement Telephone Number will be provided to

Class Members in the Published Notice, the Long Form Notice, the E-Mail Notice, and on the

Settlement Website.

3.9     ***Requests for Exclusion***.    Any Class Member who does not affirmatively opt out

of the Settlement Agreement by submitting a timely and valid request for exclusion ("Request

for Exclusion") will be bound by all of the Settlement Agreement's terms, including those

pertaining to the Released Claims, as well as the Final Approval Order and Judgment that may

be entered by the Court if it grants final approval of the Settlement.    Any Class Member

desiring to opt out from the Settlement Agreement must sign and postmark a written "Request

for Exclusion" to the Settlement Administrator on or before the Response Deadline.    The

Request for Exclusion must: (a) set forth the Class Member's name, address, telephone number,

and e-mail address; (b) be signed by the Class Member and reference the name of the Action,

"*Roberts, et al. v. C.R. England, Inc., et al.*, Case No. 2:12-CV-00302-RJS-BCW (D. Utah)"; (c)

clearly state that the Class Member does not wish to be included in the Settlement; (d) be

returned to the Settlement Administrator; and (e) be postmarked on or before the Response

Deadline.    The postmark date will be the exclusive means to determine whether a Request for

Exclusion has been timely submitted.    The Class Representative, Class Counsel, Defendants,

and Defendants' Counsel, shall not solicit or encourage any Class Member, directly or indirectly,

to opt out of the Settlement Agreement.    No person shall purport to exercise any exclusion

rights for any other person, or purport to exclude any other Class Member as part of a group,

aggregate or class involving more than one Class Member, or as an agent or representative. Any such purported exclusion shall be void and the person that is the subject of the purported opt-out shall be treated as a Class Member and be bound by the Settlement.   The Settlement Administrator shall deliver to Class Counsel and Defendants' Counsel copies of all Requests for Exclusion, together with copies of all written revocations of Requests for Exclusion, received by the Settlement Administrator no later than five (5) days after the Response Deadline, or at such other time as the Parties may mutually agree in writing.

3.10   ***Right to Object***.   To object to the Settlement Agreement, a Class Member must file a written objection to the Settlement Agreement ("Objection") with the Court before the Response Deadline.   In order for the Objection to be valid, the Objection must: (a) set forth the Class Member's name, address, telephone number, and e-mail address; (b) be signed by the Class Member and reference the name of the Action, "*Roberts, et al. v. C.R. England, Inc., et al.*, Case No. 2:12-CV-00302-RJS-BCW (D. Utah)"; (c) clearly state all grounds for the objection, including without limitation, demonstrating standing to object (i.e. membership in the Class), whether the Class Member or their lawyer intends to appear at the Final Approval Hearing, and include any written material on which their objection is based or on which they intend to rely; and (d) be filed with the Court on or before the Response Deadline.   The filing date will be the exclusive means to determine whether an Objection has been timely submitted.   The Parties have the right to conduct reasonable discovery as to the basis of any Objection on an expedited basis.   Class Members who fail to object in the manner specified above will be deemed to have waived all objections to the Settlement and will be foreclosed from making any objections, whether by appeal or otherwise, to the Settlement Agreement.   Only Class Members who file timely Objections will have a right to appear at the Final Approval Hearing in order to have their

Objections heard by the Court, but a Class Member who files a timely Objection as described above need not appear to have their Objection considered by the Court.    At no time will the Class Representative, Class Counsel, Defendants, or Defendants' Counsel, seek to solicit or otherwise encourage Class Members to submit Objections to the Settlement Agreement or appeal from the Final Approval Order and Judgment.    Class Counsel will not represent any Class Members with respect to any such Objections to this Settlement.

## IV.    PAYMENTS TO THE CLASS

### 4.1    *The Settlement Amount*.

(a)    Defendants shall cause One Million Dollars ($1,000,000) to be deposited by wire transfer into the Escrow Account within thirty (30) days of entry of the Preliminary Approval Order, which amount may be used to cover Administration Costs.    In the event that any Administration Costs arise before the date on which the One Million Dollars ($1,000,000) is to be deposited in the Escrow Account, Class Counsel shall pay the Administration Costs and seek reimbursement from the Escrow Agent after such funds have been deposited in the Escrow Account.    Defendants shall cause the remainder of the Settlement Amount to be deposited by wire transfer into the Escrow Account within thirty (30) days of entry of the Final Approval Order, regardless of any appeal that may be filed or taken by any Class Member or third party; provided that under no circumstances shall any portion of the Settlement Amount be transferred to Class Counsel, the Class Representative, or any Class Members unless and until the Effective Date occurs.    In the event that any Administration Costs surpass One Million Dollars ($1,000,000) before the date on which the remainder of the Settlement Amount is to be deposited in the Escrow Account, Class Counsel shall notify Defendants' Counsel of the additional costs that have been incurred.    Within ten (10) days of receiving such notice, Defendants shall cause

funds sufficient to cover such additional costs to be deposited into the Escrow Account.   The

Settlement Amount shall be used solely for the purposes set forth in paragraph 4.1(h) below.

(b)     Subject to Court approval and oversight, the Escrow Account will be controlled

by the Settlement Administrator.   Neither Plaintiffs nor Defendants shall have any liability

whatsoever for any act or omission of the Settlement Administrator with regard to the Escrow

Account.   The Settlement Administrator shall not disburse the Settlement Amount or any

portion thereof except as provided for in this Agreement, by an Order of the Court, or with prior

written agreement of Class Counsel and Defendants' Counsel.

(c)     The Settlement Administrator is authorized to execute transactions on behalf of

the Parties and the Class that are consistent with the terms of this Agreement and with Orders of

the Court.

(d)     All funds held in the Escrow Account shall be deemed to be in the custody of the

Court and shall remain subject to the jurisdiction of the Court until the funds are distributed in

accordance with this Agreement.

(e)     The Escrow Account shall be an interest bearing account, which shall promptly be

identified to the Parties at any Party's request by account number and any other identifying

information.   Neither the Settlement Amount, nor any portion thereof, shall be commingled

with any other monies.   Class Members shall bear all risks related to investment of the

Settlement Amount, including but not limited to any risks of uninsured default, insolvency,

fraud, theft, or illiquidity of or by the financial institution at which the Escrow Account is

maintained.

(f)     The Escrow Account is intended to be a "Qualified Settlement Fund" within the

meaning of Treasury Regulation § 1.468B-1 and any analogous local, state and/or foreign statute,

law, rule, or regulation.   The Settlement Administrator, as administrator of the Qualified

Settlement Fund within the meaning of Treasury Regulation §1.468B-2(k)(3), shall be solely

responsible for filing tax returns for the Escrow Account and paying from the Escrow Account

any taxes owed with respect to the Escrow Account.   Defendants agree to provide the

Settlement Administrator with the statement described in Treasury Regulation §1.468B-3(e).

Neither Defendants, Defendants' Counsel, Plaintiffs, nor Class Counsel shall have any liability

or responsibility of any sort for filing any tax returns or paying any taxes with respect to the

Escrow Account.

     (g)    All Escrow Taxes and Escrow Tax-Related Costs shall be timely paid by the

Settlement Administrator out of the Escrow Account.

     (h)    The Settlement Amount, together with any interest accrued thereon, will be used

to pay the following amounts associated with the Settlement:

     (1)    Compensation to Class Members determined in accordance with

paragraphs 4.2 and 4.3;

     (2)    Any Class Representative Enhancement Payments approved by the Court;

     (3)    All Attorneys' Fees and Expenses approved by the Court;

     (4)    Administration Costs; and

     (5)    Escrow Taxes and Escrow Tax-Related Costs.

     4.2    ***Distribution to Class Members***.

     (a)    All monies remaining from the Settlement Amount, including any accrued interest

thereon, after the payment of any approved Class Representative Enhancement Payments,

approved Attorneys' Fees and Expenses, and Administration Costs, Escrow Taxes, and Escrow

15

Tax-Related Costs, shall be available for distribution to the Class Members (the "Distributable Settlement Amount").

(b)      The Distributable Settlement Amount shall be divided among the Class Members according to the following formula:   All Class Members who do not opt-out of the Class will receive the minimum amount of one-thousand dollars ($1,000) (the "Minimum Payment").   The remainder of the Distributable Settlement Amount in the Escrow Account (the "Net Distributable Settlement Amount") shall be distributed *pro rata* to all Class Members who signed the VLA and ICOA between May 27, 2008 and October 31, 2010 (the "Enhanced Payment").   By way of example, if the Net Distributable Settlement Amount has $3,713,500 remaining after all Class Members receive $1,000, then the 7,427 Class Members who signed the VLA and ICOA between May 27, 2008 and October 31, 2010 would receive an additional $500 ($3,713,500/7,427 = $500).   This allocation formula reflects the fact that certain Class Members' claims would be subject to additional defenses, including, for example, statute of limitations defenses, based on when their claims accrued.

(c)      The Parties acknowledge that the data upon which the allocations described above is the best available, but may contain inaccuracies, inconsistencies, or be incomplete.

(d)      The Settlement Administrator shall be solely responsible for mailing initial checks to Class Members for their share of the Distributable Settlement Amount, which for each Class Member will be in the amount of either the Minimum Payment or the Minimum Payment plus the Enhanced Payment (the "First Check"), within sixty (60) days of the Effective Date.

(e)      Class Members must cash their First Checks within one hundred twenty (120) days of issuance (the "First Check-Cashing Deadline").   If any Class Member does not do so, his or her First Check will be void.   This limitation shall be printed on the face of each First

Check.   The voidance of checks shall have no effect on the Class Members' release of claims, obligations, representations, or warranties as provided herein, which shall remain in full effect.

(f)     If any First Checks are returned prior to the First Check-Cashing Deadline, the Settlement Administrator shall make a reasonable effort to locate intended recipients and to effectuate delivery of such First Checks.

4.3     ***Treatment of Undistributed Funds and Uncashed Checks***.

(a)     If the Distributable Settlement Amount funds remaining after the First Check-Cashing Deadline, including the value of uncashed checks, after accounting for any costs or fees that would be incurred in administering and redistributing such funds, exceed $25,000 (the "Undistributed Funds"), such Undistributed Funds shall be redistributed, after payment of any unpaid costs or fees incurred in administering and redistributing the Undistributed Funds, to Class Members who have cashed their First Checks, on a *pro rata* basis regardless of the amount of their First Check.

(b)     The Settlement Administrator shall be solely responsible for mailing second checks to Class Members for their share of the Undistributed Funds (the "Second Check") as soon as is practicable, but in no instance more than within forty-five (45) days after the First Check-Cashing Deadline.

(c)     Class Members must cash their Second Checks within ninety (90) days of issuance (the "Second Check-Cashing Deadline").   If any Class Member does not do so, his or her Second Check will be void.   This limitation shall be printed on the face of each check. The voidance of checks shall have no effect on the Class Members' release of claims, obligations, representations, or warranties as provided herein, which shall remain in full effect.

(d)      If any Second Checks are returned prior to the Second Checking-Cashing Deadline, the Settlement Administrator shall make a reasonable effort to locate intended recipients and to effectuate delivery of such Second Checks.

(e)      If either (i) the funds remaining after the First Check-Cashing Deadline do not exceed $25,000, or (ii) there are funds remaining after the Second Check-Cashing Deadline, including the value of uncashed checks, then the value of such remaining funds, together with any undistributed interested earned by the Escrow Account, shall escheat to the State of Utah (the "Escheat Amount").   As soon as practicable following the applicable Check-Cashing Deadline, the Parties shall make an application to the Court for the Escheat Amount to escheat to the State of Utah.   Any monies owed to the Settlement Administrator in connection with the Settlement shall be paid in full prior to any distribution of the Escheat Amount to the State of Utah.

4.4      ***Administration of Taxes by the Settlement Administrator***.   The Settlement Administrator shall be responsible for issuing to Class Members and Class Counsel any Forms 1099 and/or other tax forms as may be required by law for all cash amounts paid pursuant to this Settlement.

4.5      ***Tax Liability***.   Plaintiffs understand and agree that Class Members shall be solely responsible for the payment of any and all taxes and penalties assessed on the payments described herein.   Defendants make no representation as to the tax treatment or legal effect of the payments called for hereunder, and Plaintiffs are not relying on any statement, representation, or calculation by Defendants or by the Settlement Administrator in this regard.

4.6      ***Administration Costs***.   The Administration Costs shall be paid from the Settlement Amount.   Beginning forty-five (45) days after the entry of the Preliminary Approval

Order, and every thirty (30) days thereafter, the Settlement Administrator shall provide the Parties with a detailed accounting of any Administration Costs expended to date and an invoice for the amount of such Administration Costs.   Any disputes as to whether amounts billed by the Settlement Administrator are reasonable and necessary under this Agreement shall be resolved by the Court.

      4.7   ***Certification of Completion***.   Upon completion of administration of the Settlement, the Settlement Administrator shall provide to the Court, Class Counsel, and Defendants' Counsel a written declaration under oath certifying such completion.

      4.8   ***Entire Monetary Obligation***.   Notwithstanding anything else in this Agreement, Defendants shall in no event be required to pay any amounts other than the Settlement Amount. It is understood and agreed that Defendants' monetary obligations under this Settlement Agreement shall be fully discharged by paying the Settlement Amount as specified in paragraphs 1.47 and 4.1 and that Defendants shall have no other monetary obligations, or obligations to make any other payments under this Agreement or otherwise.

**V.**     **ADDITIONAL CONSIDERATION PROVIDED TO THE CLASS**

      5.1   ***Treatment of Advanced Funds Debts***.   Defendants represent that the disputed, unpaid debts owed to Defendants by certain Class Members in connection with funds advanced by Defendants (including, without limitation, for permits, licenses, and truck lease payments) (the "Advanced Funds Debts") remain active in Defendants' database and within applicable statutes of limitation by function of Defendants' pleadings in this case.   The Parties acknowledge that the face value of the Advanced Funds Debts exceed $48 million.   The Advanced Funds Debts shall not include tuition debts addressed in paragraph 5.7.   As part of this Settlement, Defendants shall treat the Advanced Funds Debts as cancelled on the belief, after conferring with their tax advisors, that such treatment shall not create taxable income for any

19

Class Member (the "Debt Treatment").   Nothing in this paragraph or this Agreement shall be construed as an official tax position about the tax consequences to any Party arising from or relating to any term or provision of this Agreement.

     5.2    ***Tax Treatment***.   Separate Forms 1099 shall be issued to Class Members by the Settlement Administrator only for each Class Member's share of the Distributable Settlement Amount.   The Parties believe that the Settlement will not create a taxable event for Class Members with regard to the Advanced Funds Debts under IRS regulations governing the discharge of indebtedness.   (See 26 C.F.R. § 108(e)(2).)   Therefore, except as specifically noted below, separate Forms 1099 shall not be issued to Class Members related to the Debt Treatment, and the Debt Treatment also shall not appear as a separate line item on the separate Forms 1099 being issued to each Class Member for their share of the Distributable Settlement Amount.   C.R. England has done its own consultation and shall not affirmatively seek IRS advice or ruling, or do anything to intentionally invite or initiate an audit on this question. Class Counsel and Class Members shall likewise not affirmatively seek IRS advice or ruling or do anything to intentionally invite or initiate an audit on this question.   Class Counsel shall be notified of the initiation of an audit, or where in the course of an audit, the IRS has raised the possibility that the cancellation of the Advanced Funds Debts may be taxable to Class Members, or generally claims C.R. England's tax treatment of the Advanced Funds Debts is an issue, and the progress of all challenges.   Plaintiffs may seek from the IRS, with prior advance notice to C.R. England and in coordination with C.R. England, the opportunity to participate by direct submission if Plaintiffs so choose in the portion of the audit pertaining solely to the Advanced Funds Debts issue.   However, if the IRS after audit, and final unsuccessful appeal by C.R. England, should C.R. England decide of their own discretion and choice to pursue such an

appeal, orders C.R. England to issue Forms 1099 for any portion of the Debt Treatment, C.R. England will comply by issuing separate Forms 1099 reflecting the fair market value of the Debt Treatment to each impacted Class Member to the extent that it is determined that the value is more than zero and not already fairly reflected in the amounts contained on the separate Forms 1099 issued to each such Class Member for their share of the Distributable Settlement Amount. (See 26 C.F.R.§ 1.6041-1(g).)[2]  The notification of impacted Class Members, and all associated costs of notification and explanation, shall be borne by C.R. England.    Such compliance shall not be a breach of the Settlement Agreement, and Plaintiffs shall accept this course and respond appropriately to any such issuance.

     5.3   ***Not Punitive***.    The Parties understand and agree that the Settlement Amount and the Debt Treatment are not punitive in nature and cannot be construed or considered as punitive damages or punitive penalties in any way.

     5.4   ***Defendants' Assistance***.    Defendants understand and agree that, if necessary, they will assist Plaintiffs in explaining to the Court the value of the forgiveness/cancellation of the Advanced Funds Debts, including by providing information, a declaration, and, if necessary, witness testimony at approval hearings explaining the amount of the debts, the source of the debts, how Defendants maintain the debt-related information, and why the debts remain collectible.

     5.5   ***Credit Reporting Agencies***.    Within ninety (90) days after the Effective Date, Defendants agree to take affirmative action to inform credit reporting agencies that the Advanced

---

[2]  In the event the IRS finally orders the issuance of a Form 1099 or otherwise requires C.R. England to provide Class Members' identity information for the forgiveness of the Advanced Funds Debts, C.R. England will provide to the impacted Class Members a detailed listing of the Advanced Funds Debts forgiven.    Such information will be retained by C.R. England and be available for an appropriate period of time after any audit is concluded.

Funds Debts are no longer collectible and/or are cancelled.   Defendants are willing to send an agreed-upon communication to the applicable credit reporting agency or agencies for this purpose.

5.6     ***Telephone Number for DAC Questions***.   Within five (5) days after the Effective Date, Defendants agree to staff a telephone hotline/number for Class Members to contact Defendants about concerns regarding the information on their DAC reports directly related to their time working for C.R. England as an independent contractor driver.   Defendants shall provide the telephone hotline/number to Class Counsel for inclusion in the Long Form Notice, Published Notice, E-Mail Notice, and on the Settlement Website, and Class Members shall be advised in those notices and on the Settlement Website that the telephone hotline/number will not be activated until five (5) days after the Effective Date.   Defendants agree to act in good faith in attempting to assist in the resolution of any complaints or inquiries made by Class Members through the hotline, though Plaintiffs acknowledge that Defendants would not be obligated to take any particular action in response to inquiries or complaints.   Defendants are willing to provide a telephone hotline/number for this purpose or inform Class Members about similar resources that Defendants already have in place, provided that any obligation to field or respond to any concerns raised by Class Members pursuant to this provision is limited to a one-year time period from the Effective Date.

5.7     ***Tuition Debt***.   The tuition debt of Plaintiffs in the approximate amount of $13 million, which sum includes interest, related to their Commercial Driver's License schooling shall remain in Defendants' database as an outstanding receivable which may be netted with any allowance for collectability.   Defendants agree to continue the passive collections process in place currently for said tuition debt and to refrain from changing the collections process to a

process or program in which they affirmatively seek to collect said student tuition debt at any time in the future.   Defendants agree to field any questions or concerns from Class Members about said tuition debt through the same process and for the same time period (one year from the Effective Date) as described in paragraph 5.6.   Nothing in this paragraph or this Agreement shall prevent any Party from taking any tax position with any taxing authority with respect to the tax character of these debts.

5.8   ***Independent Contractor Disclosures***.   With respect to any individuals who Defendants engage for the first time as independent contractor drivers during the two-year period following the Effective Date, Defendants agree to provide a written disclosure addressing motor carrier industry and company: (1) annual turnover (based on the company's then-current independent contractor drivers over the prior calendar year); (2) average time in job (based on the company's then-current independent contractor drivers over the prior calendar year); and (3) average income for independent contractor drivers (based on the company's then-current independent contractor drivers over the prior calendar year).   The disclosure would apply only to new independent contractor drivers who sign a Vehicle Lease Agreement or any equivalent agreement through which they lease vehicles from or through Defendants; it would not apply to any existing independent contractor drivers, returning drivers, or new owner-operators. Further, this notice may be added to the Independent Contractor Operating Agreement or Vehicle Lease Agreement, or any equivalent agreement(s) through which independent contractor drivers contract with Defendants in that capacity or lease vehicles from Defendants, or it may be provided as a standalone document.

## VI.   SETTLEMENT ADMINISTRATION

6.1   The Settlement Administrator shall administer the Settlement subject to the supervision of Class Counsel, Defendants' Counsel, and the Court as circumstances may require.

6.2     Defendants and Defendants' Counsel shall have no responsibility for, interest in, or liability whatsoever, with respect to: (a) any act, omission, or determination of the Settlement Administrator, Plaintiffs' Counsel, or designees or agents of the Settlement Administrator or Plaintiffs' Counsel; (b) any act, omission, or determination of Plaintiffs' Counsel or their designees or agents in connection with the administration of the Settlement; (c) the management, investment, or distribution of the Settlement Amount or the Distributable Settlement Amount; or (d) the determination, administration, calculation, or payment of any claims asserted against the Settlement Amount or the Distributable Settlement Amount.

6.3     The Settlement Administrator shall provide such information as may be reasonably requested by Plaintiffs or Defendants relating to administration of this Agreement.

6.4     Defendants shall bear their own attorneys' fees and costs, and shall continue to bear their internal costs of administration of this Settlement, including but not limited to Defendants' attorneys' fees and costs in complying with the non-monetary terms set forth in Section V., herein.

## VII.    SCOPE AND EFFECT OF SETTLEMENT AND RELEASES

7.1     ***Class Member Releases***.   Upon the Effective Date, Plaintiffs and all Class Members who do not submit a valid and timely Request for Exclusion, including their spouses, domestic partners, administrators, agents, affiliates, assigns, attorneys, executors, heirs, partners, predecessors-in-interest, successors-in-interest, and beneficiaries, past, present, and future, shall be deemed to have, and by operation of the Final Order and Judgment shall have, fully, finally, and forever released, relinquished, and discharged, and shall be forever enjoined from the prosecution of, each and every Released Claim (including unknown claims) against any and all of the Released Parties.

7.2   ***Defendant Releases***.   Upon the Effective Date, Defendants, on behalf of themselves, as well as each one's present, former, and future direct and indirect affiliates, agents, divisions, predecessors, parent companies, subsidiaries, members, and successors, fully, finally, and forever release, relinquish and discharge Plaintiffs, the Class Members, and Class Counsel from each and every claim arising out of or related in any way to the Action or the claims asserted therein.

7.3   ***Releases of Unknown Claims***.   The Parties acknowledge that they may have claims that are currently unknown and that the releases in this Agreement are intended to and will fully, finally, and forever discharge all Released Claims, whether asserted or unasserted, known or unknown, suspected or unsuspected, which now exist, or heretofore existed or may hereafter exist, that could have been asserted in the Action, which, if known, might have affected their decision to enter into this release.   Each Party shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of the United States, any state or territory of the United States, or any state or territory of any other country, or principle of common law or equity, which governs or limits a person's release of unknown claims.   In making this waiver, the Parties understand and acknowledge that they may hereafter discover facts in addition to or different from those that are currently known or believed to be true with respect to the subject matter of these releases, but agree that they have taken that possibility into account in reaching this Agreement and that, notwithstanding the discovery or existence of any such additional or different facts, as to which the Parties expressly assume the risk, they fully, finally, and forever settle and release any and all Released Claims, known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such additional or different facts.   The foregoing waiver

25

includes, without limitation, an express waiver, to the fullest extent not prohibited by law, by

Plaintiffs, the Class Members, and all Parties, of any and all rights under California Civil Code

Section 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
>
> CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
>
> FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF
>
> KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS
>
> OR HER SETTLEMENT WITH THE DEBTOR.

Plaintiffs, the Class Members, and all Parties also expressly waive any and all provisions, rights,

and benefits conferred by any law, statute, or principle of common law or equity that is similar,

comparable, or equivalent, in whole or in part, to California Civil Code Section 1542.

      7.4    ***Representation of Capacity to Settle; Indemnification of Attorneys' Fees and***

***Expenses for Breach of Release***.   The Class Representative hereby represents and warrants

that, as of the Effective Date, he has the authority to settle the Released Claims on his own behalf

and to thereby extinguish the Released Claims.   The Class Representative acknowledges that

Defendants are relying on his representations and warranties in entering into this Agreement.   If

the Class Representative, or the beneficiary of the Class Representative, brings a claim or action

that is determined to encompass a Released Claim, the Class Representative shall indemnify

Defendants for any damages awarded and any attorneys' fees, expenses, or other costs incurred

by them in defending any such action.

## VIII.   PAYMENTS TO CLASS REPRESENTATIVES AND CLASS COUNSEL

      8.1    ***Class Representative Enhancement Payments***.   Plaintiffs intend to seek Class

Representative Enhancement Payments of $43,000 for McKay and $25,000 for Roberts (the

"Class Representative Enhancement Payments").   Defendants shall not oppose Class

Representative Enhancement Payments up to those amounts.   Any Class Representative

Enhancement Payments approved by the Court shall be paid by the Settlement Administrator to

Class Counsel as soon as practicable after the Effective Date.   The Class Representative

Enhancement Payments shall be paid by the Settlement Administrator solely out of the

Settlement Amount and shall be deducted (to the extent approved by the Court) from the

Settlement Amount on or after the Effective Date and prior to the distribution to the Class

Members.   Class Counsel shall bear the sole responsibility for assuring proper distribution of

the Class Representative Enhancement Payments, if any.   The Parties agree that the Court's

failure to approve, in whole or in part, the Class Representative Enhancement Payments shall not

prevent the Settlement Agreement from becoming effective, nor shall it be grounds for

termination.   In the event that the Court fails to approve the Class Representative Enhancement

Payments, the Settlement Amount shall not be distributed until after the later of (i) the expiration

of the time to appeal the order failing to approve the Class Representative Enhancement

Payments; or (ii) if such appeal is filed, the termination of such appeal, and the expiration of the

time to obtain any further appellate review.

    8.2     ***Fee and Expense Application***.   Class Counsel intends to submit a Fee and

Expense Application, seeking an award based on the value of the Settlement and the work

performed in an amount not to exceed sixteen million dollars ($16,000,000), plus costs and

expenses.   Any amount awarded by the Court in response to such Fee and Expense Application

shall be paid by the Settlement Administrator as soon as practicable after the Effective Date

solely out of the Settlement Amount and shall be deducted (to the extent approved by the Court)

from the Settlement Amount on or after the Effective Date and prior to the distribution to the

Class Members.   The Parties agree that the Court's failure to approve, in whole or in part, Class

Counsel's Fee and Expense Application shall not prevent the Settlement Agreement from becoming effective, nor shall it be grounds for termination.    In the event that the Court fails to approve Class Counsel's Fee and Expense Application, the Settlement Amount shall not be distributed until after the later of (i) the expiration of the time to appeal the order failing to approve Class Counsel's Fee and Expense Application; or (ii) if such appeal is filed, the termination of such appeal, and the expiration of the time to obtain any further appellate review. Class Counsel shall determine the appropriate allocation of attorneys' fees and expenses among themselves, in their collective judgment and discretion, based on the expenses incurred and the contributions of counsel.

## IX.    RIGHTS OF TERMINATION AND EFFECTS THEREOF

9.1    Except as set forth above and below (including, without limitation, in paragraphs 8.1 and 8.2), if the Court or, in the event of an appeal, any appellate court refuses to approve, or modifies, any material term of this Agreement, Plaintiffs or Defendants may terminate this Agreement as set forth below.

9.2    This Agreement and the Settlement shall terminate and be cancelled if, within fifteen (15) days after any of the following events, Plaintiffs or Defendants provide written notification of an election to terminate the Settlement because:

(a)    The Court declines to provide preliminary approval of this Agreement, or declines to enter or materially modifies the contents of the Preliminary Approval Order in the form agreed to by the Parties, or the Preliminary Approval Order is vacated, reversed, or modified in any material respect on any appeal or other review or in a collateral proceeding occurring prior to the Effective Date, and such order is with prejudice;

(b)      The Court declines to provide final approval of this Agreement, or declines to enter or materially modifies the contents of the Final Approval Order and Judgment in the form agreed to by the Parties, and such order is with prejudice;

(c)      The Court's Final Approval Order and Judgment is vacated, reversed, or modified in any material respect on any appeal or other review or in a collateral proceeding occurring prior to the Effective Date, and such order is with prejudice;

(d)      The Effective Date does not occur for some other reason; or

(e)      There are material modifications to the provisions of Sections II, V, VII, or IX of this Agreement, or to paragraphs 1.38, 3.9, 3.10, 4.1, 4.5, or 4.8 of this Agreement.

9.3      This Agreement and the Settlement shall terminate and be cancelled if, within fifteen (15) days of Defendants' failure to timely pay, Plaintiffs provide written notification of an election to terminate the Settlement because Defendants failed to timely pay any financial obligation under this Agreement.

9.4      This Agreement and the Settlement may, in the discretion of either Party, terminate and be cancelled if (a) Class Members representing five percent (5%) or more of the Class opt out of the Settlement (after accounting for any subsequent revocations of such opt-outs); and (b) between fifteen (15) days and twenty (20) days after receiving written notice from the Settlement Administrator of such opt-outs, the Party provides written notification of its election to terminate the Settlement to the other Party.    Within five (5) days after the deadline for Class Members to opt out, the Settlement Administrator shall provide written notice to the Parties identifying all Class Members who have opted out of the Settlement and the percentage of the Class they represent.

9.5     In the event this Agreement is terminated or fails to become effective for any reason, then:

(a)     The Parties shall be deemed to have reverted *nunc pro tunc* to their respective status as of the date and time immediately before the execution of this Agreement and they shall proceed in all respects as if this Agreement had not been executed, and without prejudice in any way from the negotiation, fact, or terms of this Settlement.

(b)     Within fifteen (15) days of the Settlement Administrator receiving notice from any Party of such termination or failure, (i) the Escrow Agent shall return the balance of the Escrow Account, including any interest, to Defendants, and (ii) the Settlement Administrator shall provide the Parties with a report of all Administration Costs incurred.   If such termination or failure is the result of Plaintiffs' election to terminate the Settlement, then, within thirty (30) days of receiving the foregoing report from the Settlement Administrator, Class Counsel shall reimburse Defendants for half of all Administration Costs incurred.

(c)     This Section IX and its provisions shall survive any termination of the Agreement and Settlement.

X.     **MISCELLANEOUS**

10.1     ***Publicity Regarding the Settlement***.   Following Final Approval, the Parties shall issue a jointly agreed comprehensive public/press statement that, other than publicly filed court documents, notices, and interactions with Class Members and their attorneys and the Settlement Administrator, or attorney-client communications, shall be the only on- or off- record press or media comments concerning the Settlement.   The Parties shall exercise diligence and use their best efforts to not act in any manner that could risk compromising the agreed-upon tax treatment described above.   This restriction includes but is not limited to prohibiting the Parties from asserting or affirming in the press or media an aggregate settlement number that bundles the cash

component and debt forgiveness into a lump sum or that separately states the value of the debt forgiveness.    The jointly agreed comprehensive public/press statement shall state, among other things, that the Settlement is comprised of $37,800,000 plus debt relief for existing, disputed business debts owed to Defendants by Class Members, or something similar agreed to by the Parties.    Plaintiffs' Counsel shall not imply or state to anyone that this Settlement represents an acknowledgment of any wrongdoing by Defendants in this or any other matter, and shall advise Class Members not to disparage Defendants.    Nothing in this paragraph or this Agreement shall prevent Defendants from disseminating any form of communication to their employees or customers concerning resolution of the litigation so long as doing so does not violate paragraph 10.2 below concerning non-disparagement. Nothing in this paragraph prevents Class Members (other than the Class Representative) or Defendants' non-officer personnel from speaking freely concerning any matter.

10.2    ***Mutual Non-Disparagement***.    Defendants, Defendants' Counsel, the Class Representative, and Class Counsel shall make no statements, including statements to the press or any other public statements, that disparage any Party or accuse any Party of any wrongdoing regarding this Settlement or the subject matter thereof.

10.3    ***Confidential Documents***.    Within sixty (60) days of the Effective Date, each Party shall return, or confirm the destruction of, any documents or information that another Party designated as confidential pursuant to an applicable protective order.

10.4    ***Cooperation of Parties***.    The Parties to this Agreement agree to cooperate in good faith to prepare and execute all documents, to seek Court approval, to defend Court approval, and to do all things reasonably necessary to complete and effectuate the Settlement described in this Agreement.

10.5   ***Dispute Resolution***.   If a dispute arises regarding compliance with any of the provisions of an approved and executed Agreement, the dispute shall be mediated by Robert Fairbank, who shall make a non-binding decision regarding the dispute if such mediation efforts are unsuccessful.   Plaintiffs and Defendants shall each bear half the cost of any such mediation.

10.6   ***Entire Agreement***.   This Agreement, including Exhibit A, represents the entire agreement between (a) Plaintiffs and/or Class Members and (b) Defendants, and it supersedes any prior agreements, written or oral, between (a) Plaintiffs and/or Class Members and (b) Defendants concerning the subject matter hereof.   This Agreement cannot be altered, modified, or amended except through a writing executed by all Parties. This Agreement is intended by the Parties to be a binding and enforceable contract that sets forth the material terms and obligations of the Parties in connection with the Settlement.

10.7   ***Construction of Agreement***.   This Agreement shall be construed to effectuate the intent of the Parties to resolve all disputes encompassed by the Agreement.   All Parties have participated in the drafting of this Agreement, and any ambiguity shall not be resolved by virtue of a presumption in favor of any Party.   The Agreement was reached at arm's length by the Parties represented by counsel.   In the event of any inconsistency between this Agreement and the Term Sheet attached as Exhibit A, this Agreement shall control.

10.8   ***Executed in Counterparts***.   This Agreement may be executed in counterparts, all of which shall be considered the same as if a single document had been executed, and shall become effective when such counterparts have been signed by each of the Parties and delivered to the other Party.   Counterpart copies of signature pages, whether delivered in original and/or by electronic mail in pdf format, taken together shall all be treated as originals and binding signatures.

10.9   *Notices*.   Unless otherwise provided herein, any notice, request, instruction, application for Court approval, or application for Court Order sought in connection with the Agreement shall be in writing and delivered personally or sent by certified mail or overnight delivery service, postage prepaid, with copies by email, to the attention of Class Counsel or Defendants' Counsel (as well as to any other recipients that a court may specify).   Parties may change the person(s) to whom such notices should be directed by giving notice pursuant to this paragraph.   As of the date hereof, the respective representatives are as follows:

**For Plaintiffs:**

**C.J. Krawczyk**
Kravit, Hovel & Krawczyk, s.c.
825 N. Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
Telephone: (414) 271-7100
Email: cjk@kravitlaw.com

**Robert S. Boulter**
1101 Fifth Avenue, Suite 310
San Rafael, California 94901
Telephone: (415) 233-7100
Email: rsb@boulter-law.com

**Heather M. Sneddon**
Anderson & Karrenberg, P.C.
50 West Broadway, Suite 700
Salt Lake City, Utah   84101
Telephone:   (801) 534-1700
Email: hsneddon@aklawfirm.com


**For Defendants:**

**Neal R. Marder**
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, California 90067
Telephone: (310) 229-1000
Email: nmarder@akingump.com

**James S. Jardine**
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500
Email: jjardine@rqn.com

10.10   *Extensions of Time*.   The Parties may agree, subject to the approval of the Court

where required, to reasonable extensions of time to carry out the provisions of the Agreement.

10.11   *Governing Law*.   This Agreement shall be governed by and construed in

accordance with the laws of Utah without giving effect to any conflict of law provisions that

would cause the application of the laws of any jurisdiction other than Utah.

10.12   *Fees and Expenses*.   Except as otherwise expressly set forth herein, each Party

hereto shall pay all fees, costs, and expenses incurred by such Party in connection with the

Action, including fees, costs, and expenses incident to its negotiation, preparation, or compliance

with this Agreement, and including any fees, expenses, and disbursements of its counsel,

accountants, and other advisors.   Nothing in this Agreement shall require Defendants to pay any

monies other than as expressly provided herein.

10.13   *Retention of Jurisdiction*.   The Parties shall request that the Court retain

jurisdiction of this matter after the Effective Date and enter such Orders as are necessary or

appropriate to effectuate the terms of the Agreement.

[Signatures on the following page.]

IN WITNESS WHEREOF, the Parties, intending to be legally bound by this Agreement, have caused this Agreement to be executed, by their duly authorized attorneys, as of the day and year first above written.

**Agreed to on behalf of Plaintiffs and the Class**

By: _____

Robert S. Boulter, Esq.
Law Offices of Robert S. Boulter
1101 Fifth Avenue, Suite 310
San Rafael, CA   94901
Telephone:   (415) 233-7100
rsb@boulter-law.com

Kevin P. Roddy
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ   07095
Telephone:   (732) 636-8000
kroddy@wilentz.com

Stephen E. Kravit
C.J. Krawczyk
Benjamin J. Glicksman
Aaron H. Aizenberg
Benjamin R. Prinsen
Kravit, Hovel & Krawczyk, S.C.
825 N. Jefferson Street,
Suite 500
Milwaukee, WI   53202
Telephone:   (414) 271-7100
kravit@kravitlaw.com
cjk@kravitlaw.com
bjg@kravitlaw.com
aha@kravitlaw.com
brp@kravitlaw.com

Thomas R. Karrenberg, #3726
Heather M. Sneddon, #9520
Jason E. Greene, #13990

Anderson & Karrenberg, P.C.
50 West Broadway, Suite 700
Salt Lake City, Utah   84101
Telephone:   (801) 534-1700
tkarrenberg@aklawfirm.com
hsneddon@aklawfirm.com
jgreene@aklawfirm.com

Jon V. Harper, #1378
Harper Law, PLC
68 S. Main Street, Suite 800
Salt Lake City, Utah   84101
Telephone:   (801) 910-4357
jharper@jonharperlaw.com

*Attorneys for Plaintiffs and the Class*

**Agreed to on behalf of Defendants**

By: _____

Rex S. Heinke
Neal R. Marder
Gregory W. Knopp
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars, Suite 600
Los Angeles, California 90067
Telephone: (310) 229-1000

James S. Jardine (1647)
Scott A. Hagen (4840)
David B. Dibble (10222)
Adam K. Richards (14487)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 532-1500

*Attorneys for Defendants C.R. England, Inc. and Opportunity Leasing, Inc.*

# EXHIBIT A

## Settlement Term Sheet

This term sheet memorializes the material terms of the parties' agreement to resolve the action styled *Roberts v. C.R. England, Inc.* et al., No. 2:12-CV-00302 RJS (D. Utah) (the "Action"). The parties understand and agree that these terms will be further memorialized in a comprehensive settlement agreement to be submitted to the Court for approval. The parties to the agreement (collectively referred to herein as the "Parties") are plaintiff Kenneth McKay, on behalf of himself and the Class (as defined in the Court's January 31, 2017 order on class certification) (collectively, "Plaintiffs") and defendants C.R. England, Inc. and Opportunity Leasing, Inc. (collectively, "Defendants"). The material terms of the agreement are as follows:

1.  The settlement of the Action is subject to preliminary and final approval by the United States District Court for the District of Utah (the "Court") and is not effective until it becomes final and non-appealable.

2.  In consideration of the full release and discharge of the Released Claims (defined below), Defendants, on behalf of themselves and the Released Persons (defined below), shall pay into a designated fund for further disbursement "Settlement Consideration" consisting of the following:

    a.  Defendants shall pay in cash the settlement amount of $37.8 million ("Settlement Amount"), which shall include payment of all Plaintiffs' counsel attorneys' fees, costs of administration, Plaintiffs' counsel's litigation expenses, incentive awards and disbursements. Defendants shall bear their own attorneys' fees and costs, and shall continue to bear their internal costs of administration of this settlement, including but not limited to Defendants' attorney fees and costs in complying with the non-monetary terms set forth in Paragraph 5, herein.

    b.  Defendants represent that the disputed, unpaid debts owed to Defendants by certain Plaintiffs in connection with funds advanced by Defendants (including, without limitation, for permits, licenses, and truck lease payments) (the "Advanced Funds Debts") remain active in Defendants' database and within applicable statutes of limitation by function of Defendants' pleadings in this case. The Parties acknowledge that the Advanced Funds Debts exceed $48 million. The Advanced Funds Debts shall not include tuition debts addressed in Paragraph 5(d). As part of this settlement, Defendants shall forgive the Advanced Funds Debt on the belief, after conferring with their tax advisors, that such forgiveness shall not create taxable income for any Plaintiff. Nothing in this paragraph or this agreement shall be construed as an official tax position about the tax consequences to any party arising from or relating to any term or provision of this agreement.

    c.  Forms 1099 will only be issued to Plaintiffs for the cash component of the Settlement Amount payable to the individual plaintiffs, which does not include the portion of the cash component that consists of attorneys' fees, costs of administration, Plaintiffs' counsel's litigation expenses, incentive awards and disbursements. The Parties believe that the settlement will not create a taxable

1

event for Plaintiffs with regard to the Advance Funds Debt under IRS regulations governing the discharge of indebtedness. (See 26 C.F.R. § 108(e)(2).)  Therefore, except as specifically noted below, separate Forms 1099 will not be issued to Plaintiffs related to the debt forgiveness, and the debt forgiveness also will not appear as a separate line item on the Forms 1099 being issued for the cash component of the settlement. C.R. England has done its own consultation and will not affirmatively seek IRS advice or ruling, or do anything to invite or initiate an audit on this question. Plaintiffs' counsel shall be notified of the initiation of an audit, or where in the course of an audit, the IRS has raised the possibility that the cancellation of the Advance Funds Debt may be taxable to Plaintiffs, or generally claims C.R. England's tax treatment of the Advanced Funds Debt is an issue, and the progress of all challenges. Plaintiffs may seek from the IRS the opportunity to participate by direct submission if Plaintiffs so choose in the portion of the audit pertaining solely to the Advanced Funds Debt issue. However, if the IRS after audit, and final unsuccessful appeal by C.R. England, should C.R. England decide of their own discretion and choice to pursue such an appeal, orders C.R. England to issue Forms 1099 for the any portion of the debt forgiveness, C.R. England will comply by issuing Forms 1099 reflecting the fair market value of the debt forgiveness to each impacted Plaintiff to the extent that it is determined that the value is more than zero and not already fairly reflected in the amounts contained on the Forms 1099s issued for the cash component of the settlement.  (See 26 C.F.R. § 1.6041-1(g).)[1] The notification of impacted Plaintiffs, and all associated costs of notification and explanation, shall be borne by C.R. England. Such compliance will not be a breach of the settlement agreement, and Plaintiffs will accept this course and respond appropriately to any such issuance.

d.      The parties understand and agree that the cash component of the settlement and the debt forgiveness are not punitive in nature and cannot be construed or considered as punitive damages or punitive penalties in any way.

3.      The parties agree to a detailed, comprehensive release to be fully set forth in the comprehensive settlement agreement that, among other things, provides, in consideration of the Settlement Consideration, Plaintiffs shall release and discharge Defendants and certain related parties (the "Released Parties") from all claims arising from or relating to Defendants' alleged misrepresentations and omissions, Plaintiffs' independent contractor relationships with Defendants, and England's buyout agreements and distributions, including but not limited to all claims that Plaintiffs asserted or could have asserted in the Action or that otherwise arise from or relate to the subject matter of the litigation (the "Released Claims").  Defendants shall release Plaintiffs and their counsel from all claims arising from the Action.

---

[1] In the event the IRS finally orders the issuance of a Form 1099 or otherwise requires C.R. England to provide Plaintiffs' identity information for the forgiveness of the Advance Funds Debt C.R. England will provide to the impacted Plaintiffs a detail listing of the Advance Funds Debt forgiven. Such information will be retained by C.R. England and be available for an appropriate period of time after any audit is concluded.

4.     The Parties expressly waive all rights under California Civil Code Section 1542, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."  In addition, the Parties expressly waive any and all rights conferred by any law, statute, or principle of common law or equity that is equivalent or similar to California Civil Code Section 1542.

5.     Subject to agreement on final language, the parties agree to the following non-monetary terms:

     a.     Defendants understand and agree that they will assist Plaintiffs in explaining to the Court the value of the forgiveness/cancellation of the Advanced Funds Debts, including by providing information, a declaration, and, if necessary, witness testimony at approval hearings explaining the amount of the debts, the source of the debts, how Defendants maintain the debt-related information, and why the debts remain collectible.  This term is subject to revision after further consultation with tax professionals.

     b.     Defendants agree to take affirmative action to inform credit reporting agencies that the Advanced Funds Debts are no longer collectible and/or are cancelled.  Defendants are willing to send an agreed-upon communication to the applicable credit reporting agency or agencies for this purpose.

     c.     Defendants agree to provide a telephone hotline/number for Plaintiffs to contact Defendants about concerns regarding the information on their DAC reports directly related to their time working for C.R. England as an independent contractor driver.  Defendants agree to act in good faith in attempting to assist in the resolution of any complaints or inquires made by Plaintiffs through the hotline, though Plaintiffs acknowledge that Defendants would not be obligated to take any particular action in response to inquiries or complaints.  Defendants are willing to provide a telephone hotline/number for this purpose or inform Plaintiffs about similar resources that Defendants already have in place, provided that any obligation to field or respond to any concerns raised by Plaintiffs pursuant to this provision is limited to a twelve month time period from the date the settlement becomes active after final approval by the Court and the exhaustion of any objector objections and all appeals.

     d.     The tuition debt of Plaintiffs in the approximate amount of $13 million, which sum includes interest, related to their Commercial Driver's Licensing schooling shall remain in Defendants' database as an outstanding receivable which may be netted with any allowance for collectability.  Defendants agree to continue the passive collections process in place currently for said tuition debt and to refrain from changing the collections process to a process or program in which they affirmatively seek to collect said student tuition debt at any time in the future.  Defendants agree to field any questions or concerns from Plaintiffs about said tuition debt through the same process and for the same time period (one year from

3

final settlement approval by the Court and the exhaustion of any objector objections and all appeals) as Paragraph 5(c). Nothing in this Paragraph or this agreement shall prevent any Party from taking any tax position with any taxing authority with respect to the tax character of these debts.

e.    With respect to individuals who Defendants engage for the first time as independent contractor drivers during the two-year period following final Court approval of the settlement after all appeals, Defendants agree to provide a written disclosure addressing motor carrier industry and company: (1) annual turnover (based on the company's then-current independent contractor drivers over the prior calendar year); (2) average time in job (based on the company's then-current independent contractor drivers over the prior calendar year); and (3) average income for drivers (based on the company's then-current independent contractor drivers over the prior calendar year). The disclosure would apply only to new independent contractor drivers who sign VLAs; it would not apply to any existing independent contractor drivers, returning drivers, or new owner-operators. Further, this notice may be added to the ICOA or VLA or be provided as a standalone document.

6.    Defendants agree not to oppose Plaintiffs' requests for attorneys' fees (up to $16 million); (2) costs; and (3) plaintiff enhancement payments of up to $43,500 for McKay and $25,000 for Roberts—all to be paid out of the Settlement Amount. This language may be subject to change by Plaintiffs prior to the final, comprehensive settlement agreement.

7.    Neither this term sheet nor any other settlement-related document shall be deemed an admission of the validity or infirmity of any claim against Defendants, or the liability or non-liability of Defendants, and may not be used or offered in any proceeding for any purpose, except to enforce the terms of this term sheet or any stipulation of settlement in court. Nor shall this term sheet or any other settlement-related document be deemed a bar against any Plaintiff from taking any position as to the validity of any claim against Defendants in any controversy with state or federal taxing authorities. The Parties understand that there are no admissions of liability by Defendants and the Parties shall, in good faith, endeavor to communicate the terms of the settlement in a manner that is respectful of the fact that no final adjudication of fault was determined by a court or jury.

8.    Upon execution of this term sheet, the Parties shall jointly advise the Court and the Tenth Circuit Court of Appeals that the Parties have reached a settlement-in-principle and request that the Court stay the Action and the Tenth Circuit Court of Appeals stay appeal briefing. In all other respects, prior to execution of a final settlement agreement, the Parties will maintain the confidentiality of the terms of this binding term sheet. The comprehensive settlement agreement shall address the nature and extent of the publicity of the settlement, if any, following final approval of the settlement. The Parties will issue a jointly agreed comprehensive public/press statement that, other than publicly filed court documents, notices and interactions with class members and their attorneys and class agent A.B. Data, or attorney client communications, will be the only on- or off- record press or media comments concerning the settlement. The Parties will exercise diligence and use their best efforts to not act in any manner that could risk compromising the

4

agreed-upon tax treatment described above.  This restriction includes but is not limited to prohibiting the Parties from asserting or affirming in the press or media an aggregate settlement number that bundles the cash component and debt forgiveness into a lump sum or that separately states the value of the debt forgiveness.  The jointly agreed comprehensive public/press statement will state, among other things, that the settlement is comprised of $37,800,000 plus debt relief for existing business debts owed to defendants by Plaintiffs in the class, or something similar agreed to by the Parties.  No party will disparage the other. Plaintiffs' counsel   will not imply or state to anyone that this settlement represents an acknowledgment of any wrongdoing by Defendants in this or any other matter, and will advise class members not to disparage Defendants.

9.      In the event the settlement is terminated or cancelled or fails to become effective for any reason, the Parties shall be deemed to have reverted *nunc pro tuncmar* to their respective status as of the date and time immediately before the execution of this term sheet and they shall proceed in all respects as if this term sheet had not been executed, and without prejudice in any way from the negotiation, fact, or terms of this settlement.

*/////*

5

10. This term sheet is intended by the Parties to be a binding and enforceable contract that sets forth the material terms and obligations of the Parties in connection with the settlement.

Dated this Nineteenth day of September, 2018.

Named Plaintiff

_____
Kenneth McKay

Attorneys for Plaintiffs

_____
Stephen E. Kravit
KRAVIT, HOVEL & KRAWCZYK S.C.

Defendants

_____
T.J. England
Chief Legal Officer
C.R. England, Inc.

Attorneys for Defendants

_____
Neal R. Marder
AKIN GUMP STRAUSS HAUER & FELD LLP

6

Sep. 20. 2018  4:31PM                                    No. 3831   P. 2/2

10.  This term sheet is intended by the Parties to be a binding and enforceable contract that
     sets forth the material terms and obligations of the Parties in connection with the
     settlement.

     Dated this Nineteenth day of September, 2018.

                              Named Plaintiff


                              Kenneth McKay


                              Attorneys for Plaintiffs



                              _____
                              Stephen E. Kravit
                              KRAVIT, HOVEL & KRAWCZYK S.C.



                              Defendants



                              _____
                              T.J. England
                              Chief Legal Officer
                              C.R. England, Inc.



                              Attorneys for Defendants



                              _____
                              Neal R. Marder
                              AKIN GUMP STRAUSS HAUER & FELD LLP

6